# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MAVERICK THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MILLENNIUM PHARMACEUTICALS, INC. | ) | C.A. No. 2019-0002-SG |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARPOON THERAPEUTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  December 17, 2019
Date Decided:  April 3, 2020

Jody C. Barillare, of MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; OF COUNSEL: Rollin B. Chippey II and Benjamin P. Smith, of MORGAN, LEWIS & BOCKIUS LLP, San Francisco, California, *Attorneys for Plaintiff.*

John P. DiTomo, Elizabeth A. Mullin, and Aubrey J. Morin, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: John Ruskusky and Lisa C. Sullivan, of NIXON PEABODY, LLP, Chicago, Illinois, *Attorneys for Plaintiff-Intervenor.*

Gregory P. Williams, Steven J. Fineman, Nicole K. Pedi, and Angela Lam, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Martin S. Schenker and Benjamin H. Kleine, of COOLEY LLP, San Francisco, California, and Michelle S. Rhyu, of COOLEY, LLP, Palo Alto, California, *Attorneys for Defendant.*

GLASSCOCK, Vice Chancellor

This post-trial Memorandum Opinion concerns the application of medical engineering at the molecular level, to permit the human body's own defensive mechanisms to more effectively destroy cancerous tumors. The science involved, to the extent pertinent to the legal issues, is described below, at a descriptive level consonant with the writer's ability to comprehend it. Learning of the ability to conceive of such an application of molecular science, and then of the work to apply it to alleviate human suffering, is both humbling and inspiring.

Unfortunately, the behavior of some of the parties, from a legal perspective, is not inspiring, and the legal issues themselves are mundane. Defendant Harpoon Therapeutics, Inc. ("Harpoon") was in development of two methodologies to enhance the cancer-fighting properties of "T cells" in humans. To grossly oversimplify, inherently active T cell enhancement activates T cells generally; conditionally active enhancement activates T cells in the presence of tumors. Each method has potential in the treatment of different cancers. Harpoon induced Takeda Pharmaceutical Company Limited ("Takeda") to invest in the conditionally active T cell business, with Harpoon spinning off the conditionally active part of its business to a new entity, Plaintiff Maverick Therapeutics, Inc. ("Maverick") and Takeda using its wholly owned subsidiary, Plaintiff-Intervenor Millennium Pharmaceuticals, Inc. ("Millennium"), as an investment and collaboration vehicle to work with Maverick. Part of the deal was a covenant by Harpoon not to compete

for four years in the existing conditionally active T cell field, the "Maverick Field." Immediately thereafter, however, Harpoon commenced development of a conditionally active T cell process using a different activation method than the one transferred to Maverick. Maverick brought this litigation for breach of this contractual non-compete and misappropriation of trade secrets, and Millennium alleges fraud in the inducement of its investment in Maverick. This post-trial Memorandum Opinion concerns whether the non-compete was drawn broadly enough to encompass Harpoon's new methodology (I conclude that it was not), whether Harpoon developed that methodology through purloined Maverick trade secrets (I conclude that it did not), and whether Harpoon fraudulently induced Millennium's investment (I conclude that it did).

My reasoning is below.

## I. BACKGROUND[1]

This is a post-trial Memorandum Opinion. The trial took place over six days, September 9–13, and 17, 2019. The parties lodged 28 depositions and submitted a

---

[1] Citations to Joint Trial Exhibits ("JX") are expressed as JX __, at __. Page numbers for JXs are derived from the stamp on each JX page. For clarity, certain citations to JXs reference the section number of a document (§) instead of the JX page. Citations in the form "Tr." refer to the trial transcript.

joint exhibit list consisting of over 1200 exhibits. The following facts were stipulated by the parties or proven by a preponderance of evidence at trial.[2]

*A. The Parties and Relevant Non-Parties*

Plaintiff Maverick is a Delaware corporation with a principal place of business in Brisbane, California.[3]

Plaintiff-Intervenor Millennium is a Delaware corporation and wholly owned subsidiary of non-party Takeda.[4] Millennium's principal place of business is in Cambridge, Massachusetts.[5]

Defendant Harpoon is a Delaware corporation with its principal place of business in South San Francisco, California.[6]

Non-parties Dr. Luke Evnin and Dr. Patrick Baeuerle founded Harpoon to capitalize on potential cancer treatments they developed.[7] Evnin is also the founder of a private equity firm, MPM Capital, and has led investments in many biotechnology companies.[8] He serves as chairman of the board of directors for

---

[2] To the extent there was conflicting evidence, I have weighed the evidence and made findings based on the preponderance of the evidence. In pursuit of brevity, I sometimes omit from this Background discussion testimony in conflict with the preponderance of the evidence. In such cases, I considered the conflicted testimony, and I rejected it.

[3] Join Proposed Agreed-Upon Findings of Fact, Docket Item ("D.I.") 324 ("Stip."), ¶ 1.

[4] *Id.* ¶ 2.

[5] *Id.*

[6] *Id.* ¶ 3.

[7] *Id.* ¶ 4.

[8] *Id.* ¶¶ 4–5.

3

Harpoon (the "Harpoon Board") and previously served as chairman of the board of directors for Maverick (the "Maverick Board").[9] Baeuerle serves as a director on the Harpoon Board and previously served as an observer on the Maverick Board, as well as acting as a member of Maverick's Scientific Advisory Board and consultant to Maverick's management.[10] Non-party Dr. Jeanmarie Guenot is also a co-founder of Harpoon and served as Harpoon's founding Chief Executive Officer (CEO) and President.[11]

### B. Factual Background

#### 1. T Cell Therapy

T cell therapy is a leading area of drug development and a potential cure for certain types of cancer.[12] The human body produces "T cells," white blood cells that target and kill other cells in the body that are infected with viruses or pathogens.[13] T cell engager drugs, or "T cell engagers," are protein molecules designed in a laboratory and injected into the blood stream.[14] These therapeutic drugs bring the body's T cells and cancer cells together, causing the T cells to kill the cancer cells.[15]

---

[9] *Id.* ¶ 5.

[10] *Id.* ¶ 6.

[11] *Id.* ¶ 7.

[12] *Id.* ¶ 8.

[13] *Id.* ¶ 11.

[14] *Id.* ¶ 12.

[15] *Id.*

4

T cell engagers accomplish this through the use of "binding domains," protein structures that bind, or "engage" certain cells.[16] T cell engagers, therefore, generally have a "T cell engaging domain" to bind to T cells, and a "cancer targeting domain" to bind to cancer cells.[17]

Cancers, generally, can be placed into two categories: blood cancers and solid tumor cell cancers.[18] One problem T cell therapies encountered is that the T cell engagers were "inherently active," meaning they *always* recruited T cells and bound to cancer cells.[19] Unfortunately, certain healthy cells, including those in the body's vital organs, sometimes display the same proteins, called "antigens," on their surface as solid tumor cancer cells.[20] Thus, "inherently active" T cell therapies risked binding T cells to healthy cells and harming the patient.[21] In blood cancers, T cell therapies proved successful because even though the T cell therapy killed both malignant and healthy blood cells, it did not kill the patient, given the body's ability to rapidly regenerate blood cells.[22] The technology was not similarly benign,

---

[16] *Id.*

[17] *Id.*

[18] *See* Tr. 504:6–505:1 (DuBridge).

[19] *See* Stip., ¶ 9.

[20] *Id.*

[21] *Id.*; Tr. 504:6–505:1 (DuBridge).

[22] Stip., ¶ 10.

however, when used to tread solid tumor cancer cells.[23]  Thus, to date, T cell therapies have only been used to treat blood cancers, such as leukemia.[24]

### 2. Harpoon Develops the TriTAC and ProTriTAC Platforms

#### a. Inherently Active versus Conditionally Active T Cell Therapies

The goal in founding Harpoon was to develop T cell therapies for solid tumor cancers by addressing the shortcomings of then-existing T cell therapies.[25]  Harpoon did so in two ways.  *First*, it developed a drug with three binding sites that, in addition to binding to T cells and cancer cells, bound to a third site, a protein normally found in the blood called albumin.[26]  Albumin prolongs the T cell engagers' existence in the body, giving it more time to work.[27]  A molecule with this property of three binding sites is called "tri-specific."[28]  *Second*, Harpoon developed a "conditionally active" therapy using a "prodrug design" that worked like a normal T cell engager but that remained inactive until it was in the presence of a cancer cell.[29]  Cancer cells release certain unique enzymes, or "proteases," and these

---

[23] *See id.* ¶ 9.

[24] *See* Tr. 1436:4–18 (Baeuerle).

[25] Stip., ¶ 13; Tr. 1078:6–22 (Evnin).

[26] Stip., ¶ 14.

[27] *Id.* ¶¶ 14–15.  Before this advancement, the body eliminated T cell engagers from the bloodstream so quickly that patients required continual intravenous infusion to receive treatment. Tr. 453:17–454:10 (Geesaman), 868:1–7 (Marasco).

[28] Stip., ¶ 15.

[29] *Id.* ¶ 19.

proteases "activate" the conditionally active T cell engager, with the result that it only recruits T cells in the presence of cancer cells.[30]

Thus, T cell therapies can generally be divided into "inherently active" therapies and "conditionally active" therapies. Conditionally active therapies are also referred to as "inducible" therapies, meaning the therapy drug's active state is induced at the tumor site. Thus, "conditionally active T cell therapy" and "inducible T cell therapy" refer to the same concept.

Harpoon called the first advancement—prolonging the life of the therapy drug through albumin binding—its "TriTAC" platform.[31] The TriTAC platform is an inherently active T cell engager.[32] Harpoon called the second advancement— keeping the drug inactive until in the presence of a cancer cell—its "ProTriTAC" platform.[33] In early 2016, these developments were in the nascent stages, without enabling data.[34] In March 2016, Harpoon filed an initial patent application for both concepts and potential compounds encompassed by the technology.[35] The patent

---

[30] *Id.*

[31] *Id.* ¶¶ 14, 16. TriTAC is short for "Tri-Specific T-cell Activating Construct." *Id.* ¶ 14.

[32] Tr. 1452:13–23 (Baeuerle).

[33] Stip., ¶ 22. ProTriTAC stands for "Pro-Tri-Specific T-cell Activating Construct." In other words, it is the TriTAC construct, but in addition it possesses the conditionally activated aspect that makes it a "prodrug." Tr. 505:19–506:8 (DuBridge).

[34] Tr. 518:21–519:6 (DuBridge), 1184:4–13, 1189:2–21 (Evnin).

[35] Stip., ¶ 20 (U.S. Provisional Application No. 62/305,092, titled "Inducible Binding Proteins and Methods of Use").

7

application stated the purpose of the technology was "to specifically destroy cancer cells, while leaving healthy cells and tissues intact and undamaged."[36] At the time of the patent filing, Harpoon had not yet decided on a specific molecule design for its ProTriTAC therapy.[37] The patent provided "non-limiting examples" and contemplated alternative designs that could embody the technology described.[38]

To date, the FDA has approved one inherently active T cell therapy, and that approval is limited to treating blood cancers.[39] The FDA has not approved any conditionally active T cell therapies.[40]

### b. The ProTriTAC Molecule

As noted above, Harpoon developed a conditionally active T cell engager it called ProTriTAC.[41] The ProTriTAC design had three "binding domains," sometimes referred to as "binding sites," which are the parts of the molecule that allow it to attach to specific cells it encounters in the body.[42] The first binding site

---

[36] *Id.*

[37] Tr. 1524:8–17 (Baeuerle); *see also* JX 132 (correspondence between DuBridge and Baeuerle contemplating various molecule designs).

[38] JX 133, at 48–49 (Patent application stating, "[i]t should be understood that various alternatives to the embodiments of the invention described herein may be employed in practicing the invention."), 58–60 (figures illustrating concepts).

[39] Stip., ¶ 18.

[40] *Id.*

[41] *See Id.* ¶¶ 19, 22.

[42] *Id.* ¶¶ 12, 14.

is the "cancer targeting domain," which attaches to cancer cells.[43] The second binding site is the "T cell engaging domain," which attaches to T cells.[44] The third binding site is the "half-life extension domain," which attaches to the albumin protein that extends the molecule's life.[45]

The ProTriTAC's T cell engaging domain was made of a "single chain variable fragment," or "scFv."[46] Two smaller chains comprise the scFv: a variable heavy (vH) chain and a variable light (vL) chain.[47] The vH and the vL chains must be joined in order for the scFv to successfully form the T cell engaging domain and enable it to recruit T cells.[48]

Harpoon's advancement was to create a design that "split" the scFv and held the vH and vL chains apart until an activation event in the tumor microenvironment (i.e. inside the tumor) permitted them to come together.[49] Once allowed to come together, the vH and vL chains made the scFv complete, thus "activating" and giving

---

[43] *Id.* ¶ 14.

[44] *Id.*

[45] *Id.*

[46] JX 133, at 17–19, 58–59.

[47] JX 133, at 58–59; Tr. 1725:2–11 (Lin).

[48] Tr. 1740:11–1741:20 (Lin). In some citations to the trial transcript for the ProTriTAC design, the witnesses are explaining the functions of Maverick's later COBRA molecule, but that molecule is based on Harpoon's original ProTriTAC design, and so, where such is the case, the testimony accurately describes Harpoon's original ProTriTAC design.

[49] *Id.* at 589:1–5 (DuBridge).

the T cell engaging domain the ability to effectively recruit T cells.[50] In other words, as Harpoon conceived it, the ProTriTAC design would be unable to effectively recruit T cells until an activation event caused by an element present in cancer tumors removed the split in the scFv, thus permitting T cell recruitment.[51] Harpoon sometimes referred to this approach as the "split scFv" or "split dimer" concept.[52]

Associated with this concept of activation is the concept of "binding affinity." Essentially, binding affinity is the measurement of how long and with what degree of strength two things tend to stay together.[53] With the ProTriTAC molecule, the vH and vL chains, on their own, have no binding affinity to T cells; once they come together after the activation event, the complete scFv chain has a binding affinity to T cells.[54] The impairment—here, the split in the scFv chain—works much like an on/off switch, preventing binding when it is in place, and permitting binding when it is removed.[55]

---

[50] *Id.* at 589:1–5 (DuBridge), 1740:11–1741:20 (Lin).

[51] *Id.* at 1740:11–1741:20 (Lin).

[52] *Id.* at 1079:18–1080:3-8 (Evnin), 583:9–23 (DuBridge).

[53] *Id.* at 558:18–559:6 (DuBridge). Technically, binding affinity is the binding strength between "a ligand and its binding site," meaning the portion of the molecule that attracts a specific partner. *See id.* at 616:23-617:2 (DuBridge). A molecule as a whole has a binding affinity, and the particular binding sites on the molecule also have binding affinities, which may differ from the binding affinity of the molecule, depending on the context. *Id.* at 1930:20–1931:23 (Tidor) (discussing test that isolates the binding affinity of the immune effector target site from the binding affinity of the whole molecule).

[54] *Id.* at 1932:7–24 (Tidor).

[55] *Id.* at 756:4–19 (Landes), 692:10–14 (May).

Harpoon had two separate ideas for splitting the scFv to achieve a conditionally active molecule.[56] The first idea involved a "linker" that prevented the formation of the scFv until a protease—the enzyme released by cancer cells—in the tumor microenvironment cleaved the linker.[57] The second idea paired "dummy" domains with the existing domains: a dummy vH paired with the functional vL, and a dummy vL paired with the functional vH.[58] Once the molecule came within the tumor microenvironment, the cancer cell's proteases cleaved the links between the dummy and functional domains, allowing the dummy domains to fall away and the functional domains to come together, creating a fully-functional scFv with an active T cell engaging domain.[59] These two ideas shared a common feature: neither approach allowed the ProTriTAC design to bind to T cells until proteases in the tumor microenvironment cut the linkers away, allowing the vH and vL chains to come together and create the fully-functional scFv.[60]

---

[56] *Id.* at 1080:9–13 (Evnin).

[57] JX 133, at 59; Tr. 509:11–510:4 (DuBridge); Stip., ¶ 19.

[58] JX 155, at 4–5; Tr. 513:6–514:8, 582:18–23 (DuBridge).

[59] Tr. 583:1–5 (DuBridge).

[60] *Id.* at 582:6–584:11 (DuBridge).

This is a graphic representation of Harpoon's ProTriTAC designs:





These two approaches to creating conditionally active T cell engagers were the only ones Harpoon had developed by the time it spun out the new company, Maverick.[62]

### 3. Harpoon Spins Out Maverick

Around the time of the patent filing in early 2016, Harpoon began considering strategic transactions to sell off portions of its technology portfolio.[63] At that point, Harpoon was still actively developing both conditionally active and inherently active

---

[61] JX 131, at 60–61.

[62] Tr. 1079:20–1080:13 (Evnin), 1459:24–1460:8 (Baeuerle). Harpoon had a concept for another conditionally active T cell engager called TetraTAC, discussed further below, but this engager had four domains and therefore fell outside the "Maverick Field" the parties eventually developed. Tr. 1463:1–24 (Baeuerle).

[63] *Id.* at 1080:20–1081:12 (Evnin).

T cell therapies.[64] It reached out to several companies regarding a strategic transaction, but Takeda expressed the most interest.[65] The parties quickly centered on a build-to-buy structure for a potential transaction—meaning that Takeda would invest in the new company and then have an option to purchase it after a certain time period.[66] Under the dual build-to-buy the parties discussed, Harpoon would spin out certain technologies into a new company, Maverick, and Millennium—Takeda's subsidiary—would enter separate build-to-buy collaborations with each of Harpoon and Maverick.[67] The parties commenced negotiations with this structure in mind.[68]

When negotiations commenced, Maverick did not yet exist, and so there was some confusion over whether Harpoon's counsel, Wilson Sonsini Goodrich & Rosati ("WSGR"), represented both Harpoon and the not-yet-existing spinout, Maverick, or just Harpoon.[69] Harpoon contends it represented and negotiated on behalf of the not-yet-existing Maverick.[70] For practical purposes, a joint privilege

---

[64] Stip., ¶ 21.

[65] Tr. 1081:13–1082:4 (Evnin).

[66] *Id.* at 1082:5–1083:17 (Evnin).

[67] *Id.* at 1082:13–1083:11 (Evnin); Stip., ¶ 21.

[68] Stip., ¶ 21.

[69] *Compare* Tr. 379:7–11 (Hurff) ("Q: You also understood that [WSGR] was representing Maverick during the negotiations of the ATA and collaboration agreement; isn't that right? A: Yes.") *with* Tr. 1355:4–8 (Hostetler) ("Maverick was not a client of [WSGR], correct . . . ? A: Yes, that is correct. It was not a client."). WSGR's attorney, at trial, testified that his firm represented "the future interests of Maverick" because it wanted both companies to succeed. Tr. 1318:2–15 (Hostetler).

[70] *Id.* at 1094:24–1095:4 (Evnin), 1318:2–15 (Hostetler).

between Harpoon and Maverick existed throughout this litigation regarding certain communications between Harpoon personnel and counsel at WSGR.[71] And Harpoon's co-founder Guenot would sign the spinout agreement for Maverick.[72] As a substantive matter, however, negotiations for the spinout as a whole were between Harpoon on one side, and Takeda, acting through Millennium, on the other.[73] In addition, although Millennium was not a party to the Asset Transfer Agreement (the "ATA") between Maverick and Harpoon, it commented on and approved that agreement.[74]

### a. The Parties Negotiate for Two Separate Build-to-Buys: Harpoon and Maverick

Much of the discussions in early negotiations centered on dividing the technologies on which Maverick would focus versus the technologies on which Harpoon would focus. Harpoon emphasized that it possessed a "discovery platform," which would allow Millennium to invest at the earliest stages of

---

[71] This joint privilege applied through trial, requiring some courtroom choreography.

[72] *See* JX 1.

[73] Tr. 237:13–20 (Hurff), 714:22–715:9 (Hiett), 1189:22–1191:4, 1199:8–17, 1256:20–1257:18 (Evnin), 1340:16–1341:10 (Hostetler). The parties often refer to Millennium and Takeda interchangeably. Millennium, in its briefing, refers to its claims as "Takeda's causes of action." Post-Trial Response Br. of Millennium Pharmaceuticals, Inc., D.I. 321 ("Millennium Reply Brief"), at i. For the sake of clarity, to the extent possible, I attempt to distinguish between these entities in this Memorandum Opinion.

[74] Stip., ¶¶ 29–30. The Asset Transfer Agreement ("ATA") also disclaims third-party beneficiaries. JX 1, § 9.14.

14

development.[75] Millennium witnesses testified that a discovery platform, to them, meant "a breadth of potential" that covered an entire field or range of experimental ideas.[76] This understanding matched initial explorations: to maximize the value of both build-to-buys, Harpoon would continue to work on inherently active T cell therapies, and Maverick would be spun out to work on conditionally active T cell therapies, with Millennium investing in both.[77] Meetings between Millennium's Chris Arendt and Harpoon's Patrick Baeuerle and Luke Evnin seemed to match this concept of a broad platform for Maverick: they referred to the conditionally active platform as a "discovery platform," and Baeuerle described the conditional technology as "modular," which Arendt took to mean it was a versatile platform with many elements that could be rearranged.[78]

Harpoon's representations at this time, including a presentation, identified the Harpoon trajectory as working on the TriTAC platform—or inherently active technology—and identified the Maverick trajectory as working on the ProTriTAC

---

[75] Tr. 22:6–9 (Hurff), 8:16–9:10, 12:4–11 (Arendt), 1255:14–18 (Evnin).

[76] *Id.* at 8:16–9:10 (Arendt).

[77] *Id.* at 20:16–24 (Arendt), 1082:13–1084:4 (Evnin) (testifying that Harpoon "would spin out the nascent conditionally active technology into a new company, which we then referred to as Maverick.").

[78] *Id.* at 12:4–23, 13:9–14:19 (Arendt).

15

platform—or conditionally active technology.[79] According to Millennium, Harpoon never departed from this basic divide of the technologies.[80]

In June 2016, Millennium sent concept sheets to Harpoon to begin establishing the structure of the build-to-buy transactions.[81] These concept sheets, like the discussions, identified Harpoon's pursuit of its inherently active platform (at that time called TRIDENT) and Maverick's pursuit of Harpoon's inducible platform.[82] Six term sheets exchanged by Harpoon and Millennium over June and July 2016 all stated that Maverick would spinout "technology and intellectual property relating to [Harpoon's] inducible T-cell engagement platform."[83] Millennium communicated through meetings and term sheets that the conditionally active platform would require significant development, and that what attracted

---

[79] JX 143, at 65 (describing the partnership as dividing Harpoon into "TRIDENTS [i.e. inherently active] (build to buy)" and "CD3 Inducible Platforms (spinout)"); Tr. 19:3–20:24, 21:8–23 (Arendt), 1082:13–23 (Evnin).

[80] Tr. 21:8–23, 25:21–26:14, 37:15–38:14 (Arendt); 222:17–223:19 (Hurff).

[81] *See* JX 156.

[82] *Id.* at 2 ("Harpoon Collaboration. During a research term of approximately four years, the parties would collaborate on the development of Harpoon's Trident platform"), 4 ("Maverick Spin Out. . . . Harpoon would spinout a newly created entity ('Maverick') that would hold the technology and intellectual property relating to its inducible T-cell engagement platform."). The parties use the terms "platform" and "space" interchangeably to describe areas of technology. Thus, the "inducible space" or the "conditionally active platform" describe generally technologies associated with conditionally active T cell engagers.

[83] *Id.* at 4 (June 3, 2016 term sheet); JX 159, at 5 (June 13, 2016 term sheet); JX 168, at 8 (June 23, 2016 term sheet); JX 167, at 6 (June 24, 2016 term sheet); JX 169, at 8 (June 29, 2016 term sheet); JX 191, at 8, 20 (July 21, 2016 term sheet).

16

Takeda was the "bold vision" of the early-stage discovery.[84] To achieve this, Millennium witnesses testified, they intended the Maverick spinout to create a "broad kind of ring fence" around the concept of the inducible T cell platform and permit "different ways" to achieve conditionality, an intent they testified that they communicated to Harpoon.[85]

Presentations and term sheets through July and August 2016 maintained this concept. Dr. Robert DuBridge, a Harpoon scientist who joined Maverick upon its spinout, gave a presentation to Takeda emphasizing that the conditionally active technology would have different iterations along the way, and that there would be different ways to achieve conditional activation.[86] Evnin, Guenot, and Baeuerle all attended this presentation and did not voice disagreement with the description DuBridge provided.[87] At the same time as these discussions and presentations described a broad discovery platform, they all focused on a conditionally active design that utilized the "split scFv" feature of the ProTriTAC design, described

---

[84] JX 156, at 4, JX 167, at 3, 7; JX 168, at 3, 9, 14, 18; JX 169, at 9, 15, 20; Tr. 226:10–228:12 (Hurff), 31:6–33:24, 36:16–37:6 (Arendt).

[85] Tr. 36:11–39:17, 47:17–48:4, 48:9–18, 49:3–50:11, 50:14–51:11 (Arendt) (testifying Maverick spinout intended to create "ring-fence" around inducible space); Tr. 96:10–21 (Arendt) (testifying the "ring-fence" concept was communicated clearly to Harpoon); *see also* JX 191, at 23 (defining "Maverick Platform Improvements" as "any optimization, enhancement, improvement or modification to any of the [various] components of the Maverick Licensed Intellectual Property").

[86] JX 155; JX 187, at 49; Tr. 42:22–44:2, 44:23–45:21 (Arendt), 526:18–527:5 (DuBridge).

[87] Tr. 46:8–17 (Arendt).

above.[88]  In other words, while it expected to invest in a broad discovery platform, Millennium understood that the existing technology Harpoon would spin out into Maverick involved the "split scFv" design.[89]  This made sense, given that at the time of these negotiations, Harpoon had never worked on or shown Millennium a conditionally active platform that did not utilize this design.[90]

### b. The Parties Define the Maverick Field as Millennium Settles on a Single Build-to-Buy

Once negotiations had progressed by August 2016, Harpoon commenced defining the "Maverick Field"—the precise definition of what would be spun out in the new company—in the ATA.[91]  By this point, Harpoon understood that Takeda might invest in both build-to-buys, or it might invest in only one build-to-buy, and so each company needed a "growth path" for its future.[92]

Each side proceeded with negotiations, but they proceeded with distinct concepts of what the Maverick Field encompassed.  Millennium continued to view

---

[88] *E.g.* JX 152, at 7; JX 187, at 48–57; JX 278, at 5.

[89] *See* JX 171, at 2 (Arendt describing conditional aspect of Maverick as "scFv that has been sliced in half"); JX 262, at 8 (describing "Inducible T-cell Engager Platform Overview" and noting that activation is achieved by "local formation of a functional CD3 scFv"); JX 378, at 1 (describing "scFv . . . coming together" as activation tool); JX 395, at 3–4 (describing Maverick "M[ode] O[f] A[ction] as reconstitution of cleaved scFv").  One exception was that Millennium was aware of Harpoon competitors that used different techniques for achieving conditionality, and they wanted the "broad kind of ring fence" to encompass these alternative approaches.  Tr. 50:14–51:11, 208:14–209:20 (Arendt).

[90] Tr. 144:22–147:24 (Arendt), 386:1–13 (Hurff).

[91] Evnin Dep. Tr. Vol. I, 90:10–92:6; JX 195-A.

[92] Tr. 1089:1–11 (Evnin).

18

the Maverick Field as a broad discovery platform ring-fencing the concept of inducible T cell engagers.[93] Further, Millennium personnel believed they communicated this understanding to Harpoon through various meetings, discussions, and emails.[94] By contrast, internal emails between Evnin, Guenot, and counsel at WSGR—emails never shared with Millennium—reveal that they intended the Maverick Field to be limited to the split scFv design described above, which was the only concept of conditionally active T cell engager Harpoon had developed at that point.[95] Harpoon internally exchanged multiple drafts of the "Maverick Field" (the contractual language that would ultimately define the transferred intellectual property), revising the definition until, according to their testimony, they had what they felt was a "[s]imple and clear" definition that captured the split scFv inducible design.[96]

Consistent with this intent to limit the Maverick Field, Harpoon and WSGR made several revisions intended to "close loopholes" that could have allowed

---

[93] Tr. 223:8–224:14, 387:15–389:4 (Hurff), 52:15–54:20, 63:3–23, 69:17–24 (Arendt).

[94] JX 241 (September 2, 2016 diligence meeting overview); JX 278 (Presentation from September 2, 2016 meeting); JX 288, at 3 (meeting notes inquiring whether definition of Maverick Field is "broad enough to capture all relevant rights that should be allocated"); Tr. 63:3–23, 69:17–24, 72:14–73:3 (Arendt), 241:11–242:2 (Hurff).

[95] JX 206, at 1 (discussing whether to give Maverick all inducible or only "the current Maverick embodiment"); Tr. 1095:14–1096:16 (Evnin); Guenot Dep. Tr. 67:13–18; JX 227-A, at 1 (Evnin writing, "trying to keep [the Maverick Field] focused on the current Maverick invention or something very close to it").

[96] JX 238, at 1 (WSGR counsel writing, "this matches my understanding of the technology and IP. Simple and clear."); JX 235, at 1; JX 220; Tr. 1333:5–19 (Hostetler), 1152:19–1153:1 (Evnin). .

Harpoon to bypass the Maverick Field and utilize the split scFv design in the future.[97]

Counsel at WSGR testified that the intent was to protect Maverick's right to exploit the split scFv design while preserving Harpoon's ability to continue to explore other inducible technologies.[98] In internal correspondence, WSGR counsel wrote that the "main thing that shifts the balance is keeping the concept of inducible within Harpoon."[99] Millennium, for its part, also requested revisions to the language in the ATA, discussed further below, such as broadening terms to encompass all T cell target sites rather than a specific one.[100]

In late October 2016, after Millennium entered into non-disclosure agreements and performed due diligence on Harpoon's technology, it expressed an interest only in Harpoon's ProTriTAC platform, in other words, the inducible technology to be spun out into Maverick.[101] The parties proceeded with negotiations toward the single build-to-buy, with Harpoon remaining an independent company.

On November 3, 2016, Baeuerle sent plans for the separation of the companies titled, "Separation of Harpoon (TriTAC platform) and Maverick (Pro-TriTAC

---

[97] *See* JX 318, at 1; Tr. 1349:1–10 (Hostetler); JX 246, at 1–2; JX 245, at 1; JX 251-A, at 1; JX 250-A, at 1–2; Tr. 1221:3–10 (Evnin).

[98] Tr. 1328:15–1329:13 (Hostetler).

[99] JX 246, at 1.

[100] Tr. 257:13–258:8, 260:21–261:2 (Hurff). Millennium also revised albumin-specific language to a broader definition encompassing any half-life extending domain. Tr. 250:1–251:1 (Hurff).

[101] Stip., ¶ 22.

platform)."[102]  Further, during this negotiation period, Harpoon did not employ the term "Maverick design," "split scFv," or "split dimer" to describe what it intended to transfer, nor do these terms appear in the finalized contracts.[103]  Harpoon personnel testified that they thought communicating the limitations in the Maverick Field definition was unnecessary because, as Evnin put it, he believed the definition "was understood by all."[104]  By contrast, Millennium witnesses testified that at meetings they specifically discussed moving beyond the split scFv design, given that it was unproven at that point.[105]

Starting in November 2016, after Millennium had settled on a single build-to-buy transaction, the negotiations hit a snag.  Because it had decided not to purchase Harpoon, Millennium agreed to license back all of the Maverick IP for Harpoon's use outside the Maverick Field (the "Grant-Back License").[106]  At that point, the Maverick Field was limited to immune effector target binders that bound to CD3, the most popular and well-known T cell target.[107]  Millennium realized that as the Maverick Field was drafted at that time, Harpoon would be able to "generate an

---

[102] JX 366, at 3.

[103] Tr. 78:13–79:10, 198:17–199:5 (Arendt), 450:6–15 (Geesaman); 532:11–533:1 (DuBridge); 1224:1–1225:10, 1261:21–1262:3 (Evnin), 1382:7–11, 1388:13–20 (Gerber), 1351:24–1352:3 (Hostetler); Guenot Depo. Tr. 21:18–25; JX 1, § 1.56.

[104] *Id.* at 1261:21–1262:3 (Evnin).

[105] Tr. 78:13–79:10 (Arendt).

[106] JX 383, § 2.2(b).

[107] JX 383, § 1.50.

essentially similar platform" simply by using a T cell target other than CD3.[108] It proposed rewriting the definition to replace "CD3" with "Immune Effector Target," a defined term that included all T cell receptors, as well as adding the non-compete.[109]

In early December, Harpoon rejected the proposal to expand the Maverick Field language from "CD3" to "Immune Effector Target."[110] At Millennium, Arendt "freaked out."[111] He worried that without this expansion from "CD3" to "Immune Effector Target," he was "losing . . . exclusive inducible platform."[112] Hurff summarized that Arendt hoped to "[b]uild a wall around all things T-cell (preclude any inducible platform to Harpoon for T-cells, not just CD3)."[113] Hurff, in the same email, proposed alternatives to Arendt's "minimum/final" position to "preclude any inducible platform to Harpoon for T-cells."[114] These alternatives included limiting the Grant-Back License, shortening the length of the non-compete for an expanded field, or revising the financial terms.[115] Ultimately, Millennium achieved the

---

[108] *See* JX 445, at 3.

[109] JX 406, §§ 1.43, 1.56, 7.5.

[110] *See* JX 433, at 13–14

[111] *See* JX 426, at 1.

[112] JX 445, at 2.

[113] *Id.*

[114] *Id.* at 3–4.

[115] *Id.*

22

expanded definition, and the final Maverick Field reflects the broader "Immune Effector Target" as a defined term, the definition of which includes all T cell targets.[116]

At the very end of December, two days before the ATA was signed, Evnin wrote an email to Maverick CSO Hans-Peter Gerber and Harpoon CEO Dr. Gerald McMahon summarizing the deal terms.[117] In this summary, Evnin described the Maverick Field as "inducible T cell engagers (except NKT cells) of the 'Maverick' design."[118] The next day, Guenot wrote to the Harpoon and Maverick Boards, summarizing the deal, and used this same language: the Maverick Field would be "Inducible T cell engagers (except NKT cells) of the 'Maverick' design."[119] Thus, on the eve of the transaction, Harpoon appeared to attempt to communicate, however vaguely, that it viewed the transferred IP as an inducible T cell engager of a specific design, rather than broad rights to the inducible space. Harpoon never clarified what it meant by the term "Maverick Design," and Maverick CSO Gerber and Maverick

---

[116] JX 1, §§ 1.56, 1.43. "Natural killer T cells" were excluded at Harpoon's request. JX 1, § 1.43.

[117] JX 550, at 1.

[118] *Id.*

[119] *Id.*

23

Board member Geesaman never asked.[120] These summaries were not shared directly with Millennium.

Harpoon and Maverick entered the ATA on December 30, 2016, and Millennium and Maverick entered a Collaboration Agreement (the "Collaboration Agreement"), which provided for funding from Millennium, as well as a Warrant to Purchase Common Stock of Maverick Therapeutics, Inc. (the "Warrant Agreement" and together with the ATA and Collaboration Agreement, the "Agreements"), which provided Millennium with the right to later acquire Maverick.[121] Shortly after the spinout finalized, other large pharmaceutical companies that had expressed interest in Harpoon—including Merk, Eli Lilly, Pfizer, Johnson & Johnson, and AZ/MEDI—communicated that they were only interested in the conditionally active platform.[122]

The parties thus entered into these contracts without explicitly having discussed the limits of the Maverick Field. At trial, each party offered circumstantial evidence that the other party shared its understanding of the Maverick Field.

---

[120] Tr. 480:6–481:3 (Geesaman), 1422:6–1423:8 (Gerber). Geesaman had used the term "the Maverick Technology" in a memo describing the split scFv design, but also described potential arrangements as being "quite flexible." JX 593, at 6; Tr. 483:8–486:19 (Geesaman).

[121] Stip., ¶ 23; JX 2; JX 3.

[122] JX 644, at 2 (Merk); JX 740, at 2 (Eli Lilly); JX 758, at 6 (Pfizer), 12 (AZ/MEDI); JX 769, at 4 (Johnson & Johnson); JX 1200, at 2 (Eli Lilly).

Harpoon purported to show that Millennium understood the Maverick Field as limited to the split scFv design:

- In personal notes, Millennium's business negotiator Chris Hurff wrote that Arendt's position on the spinoff was that "[Harpoon] can go for inducible, just not based on this IP."[123]
- As discussed, Hurff offered alternative negotiating positions, one of which was to impose "[s]ome time limit before Harpoon could do any T-cell work (3 years?)."[124] At this point, a non-compete prohibiting Harpoon's work in the Maverick Field for four years was already in place, and so Harpoon infers that if Hurff understood that a three-year limitation would go beyond what was already in place, Millennium understood the current definition did not include all work on conditionally active platforms.[125]
- Millennium's descriptions of the Maverick technology in presentations to Takeda match the split scFv concept.[126]
- On the date the ATA was signed, Arendt wrote that "version 2" of the Maverick technology might be an "entirely new conditional approach if approved at [Joint Steering Committee]."[127] Under the Collaboration Agreement, Joint Steering Committee approval was only required if a design was outside the Collaboration Field, which was defined largely identical to the Maverick Field, except that it limited the immune effector targets to CD3, a specific T cell expression.[128] Thus, Harpoon infers, Millennium understood that new approaches to inducible T cell engagers would fall outside the Maverick Field.
- WSGR counsel recalled discussions of lab notebook redactions for transferring IP to Maverick that he suggested, based on his proposed

---

[123] JX 426, at 1.

[124] JX 445, at 3.

[125] At trial, Hurff was unable to reconcile these positions and testified that he may have forgotten about the existing non-compete when he wrote this email. Tr. 357:7–363:22 (Hurff).

[126] See JX 262, at 8–9; JX 583, at 5–7; JX 1017, at 5, 6–7, 17, 25, 29. Essentially, these presentations describe the ProTriTAC technology as it existed, including the split scFv design.

[127] JX 562, at 1.

[128] JX 2, § 2.1.1(c), § 3.4 (requiring approval if immune effector targets are expanded beyond CD3).

redactions, indicated the transferred IP was limited to the split scFv design in the provisional patent application.[129]

- During negotiations, no one at Harpoon explicitly told anyone at Millennium that they would *not* be developing conditionally active T cell engagers after the spinout.[130]

Conversely, Millennium and Maverick purported to show that they understood the Maverick Field as encompassing a broad range of inducible T cell platforms and that Harpoon, though it understood this, never disabused them of the notion or shared its own intent:

- Millennium representatives as well as Harpoon employees that joined Maverick as of the spinout testified, corroborated by contemporaneous notes and correspondence, that they understood the Maverick Field to encompass all conditionally active T cell engagers.[131]
- New Maverick employees, including CSO Gerber and CEO Jim Scibetta testified the reason they joined Maverick was because of the exclusive right to work with conditionally active T cell engagers, and that they would not have joined the company if they knew its protected work was limited to a single design.[132]
- Likewise, Millennium representatives testified that the factor justifying the planned massive investment in Maverick was their understanding

---

[129] Tr. 1338:18–1339:5 (Hostetler).

[130] Tr. 287:10–290:24, 307:13–18 (Hurff). Hurff testified at his deposition that Harpoon had expressly said they would not compete in the inducible space following the spinout, but at trial testified that he could not recall any specific conversations to that effect. *Id.*

[131] JX 422, at 20–21 (Gerber's notes describing spinout as giving "[Takeda] exclusive access to T[]cell"); JX 583, at 3 (presentation describing spinout as "[o]ption to acquire Inducible T-Cell Engager company Maverick . . . and the company's Discovery Platform"); Tr. 1375:3–20, 1381:3–14, 1384:19–1385:12 (Gerber).

[132] JX 422, at 20–21; Tr. 1375:3–1382:11 (Gerber); JX 370, at 1; JX 366, at 3; Tr. 545:1–547:7 (DuBridge), 885:10–21 (Scibetta), 644:13–645:17 (May). In total, nine Harpoon employees accepted employment with Maverick as of the spinout. JX 1, at Schedule 1.113. DuBridge, tasked with separating the companies, testified that he did so based on the understanding that Maverick would be working in the conditionally active T cell engager field, and Harpoon would not. Tr. 535:7–537:19, 545:20–546:4 (DuBridge).

26

that the Maverick IP covered the entire conditionally active T cell engager platform.[133]

Although it has designed over 750 different molecules since the spinoff, Maverick has not researched any designs that do not utilize the split scFv concept.[134] Maverick scientists DuBridge and Arendt both acknowledged that inducible T cell engager designs exist, including some invented by Harpoon, that fall outside the Maverick Field and that Harpoon would be free to develop these.[135]

### c. Harpoon Avoids Disclosing Plans to Develop Inducible T Cell Engagers After the Spinout

Prior to the transaction, Harpoon never informed Millennium that it intended to develop competitive conditionally active T cell therapies following the Maverick spinout.[136] To the contrary, Harpoon emphasized its intent to continue to develop its inherently active platform.[137] In communications with investors regarding its Series B financing in December 2016, Evnin and Harpoon CEO McMahon stated that "the Pro-TriTAC platform for conditional activation of T cells in the tumor microenvironment, has been spun out into sister company Maverick," and that

---

[133] JX 426; Tr. 422:4–423:5 (Hurff); JX 451, at 1–4; JX 527-PPT, at 3; Tr. 439:13–24, 442:16–443:2, 444:12–23, 446:2–447:8, 458:17–459:8, 461:13–18 (Geesaman).

[134] Tr. 518:21–519:1, 588:11–589:10 (DuBridge).

[135] *Id.* at 577:18–578:23, 579:4–10 (DuBridge), 199:11–24 (Arendt).

[136] *Id.* at 247:18–22 (Hurff), 461:13–18 (Geesaman), 547:11–15 (DuBridge), 1401:5–11 (Gerber), 1215:1–8, 1238:8–12, 1258:20–1259:2 (Evnin).

[137] *Id.* at 19:10–20:6 (Arendt), 1226:22–1227:12 (Evnin), 1381:8–17, 1385:4–12 (Gerber).

"Harpoon has retained rights for Pro-TriTACs (conditional activation in the tumor) for the engaging of all other immune cells (except T cells)"; a position that mirrors Millennium's current litigation position.[138] In an email to Bard Geesaman shortly before the transaction closed, Evnin described the Maverick Field simply as "[i]nducible T cell engagers."[139] He stated in an internal email to Baeuerle and McMahon that due to the non-compete that would be included as part of the transaction, "the inducible element . . . is off limits."[140]

Around the same time, less than two weeks before the transaction closed, Evnin and Baeuerle discussed a plan for Harpoon's future inventions in light of the non-compete the parties were negotiating.[141] Evnin described the spinout to Baeuerle as being "for cd3 directed inducible antibodies," and noted Millennium's push to expand this definition to all T cell targets.[142] He wrote that such a change would prevent Harpoon from competing "in the space of T cell redirection therapy with an inducible Maverick like approach (on the IP that is currently filed or on current know how)."[143] Baeuerle responded that it "[w]ould be great to have a CD3

---

[138] JX 430, at 1; *see also* JX 438, at 1; JX 456, at 1; JX 558, at 1; JX 590, at 1. Harpoon continued to use the same language in investor communications immediately after the spinout. JX 623, at 1; JX 655, at 1.

[139] JX 587, at 1.

[140] JX 630, at 1.

[141] JX 476, at 1–3.

[142] JX 476, at 2.

[143] *Id.*

28

binding domain formed from two pieces defined in the Maverick Field (…because I have an idea to get to T cell engagers without)."[144] Evnin replied, "I think if we invent something NEW it is not part of this deal. . ."[145] Baeuerle confirmed, "[t]hat's what I am up to. Perhaps we should invent after the deal is closed."[146] Baeuerle went on to describe his idea: "It does not depend on bipartite CD3 binder (T's [Takeda]'s nightmare)."[147] Evnin suggested, "[p]erhaps better for in person at this point," and Baeuerle agreed to take the discussion offline.[148]

In addition, on October 14, 2016, during due diligence, Harpoon filed a patent application involving conditionally active technology.[149] Harpoon withheld disclosure of this patent information from Millennium. Harpoon claimed that because its disclosure obligations were contained to the Maverick Field, and because it considered the Maverick Field to be limited to the split scFv design, it was not obliged to disclose this patent application regarding a conditionally active

---

[144] *Id.*

[145] JX 474, at 1.

[146] *Id.*

[147] JX 476, at 1.

[148] *Id.* At trial, Baeuerle testified they took the discussion offline not to avoid a paper trail but because Evnin was physically nearby at MPM Capital's office and a face-to-face discussion would be simpler. Tr. 1467:12–22 (Baeuerle).

[149] JX 336.

engager.[150] Nonetheless, Harpoon withdrew the application for the remainder of the due diligence period and only refiled it after the Agreements were finalized and the spinout completed, assuring that Millennium did not see it.[151]

Shortly before closing, on December 21, 2016, Evnin reminded others that "in the context of a [joint] release with Takeda we do not want to [be] raising their ire about other technologies currently at Harpoon (that they do not know about now)."[152] Evnin testified that he wanted to avoid reopening negotiations, particularly around the Maverick Field definition.[153] Maverick's soon-to-be CSO, Gerber, was included on this email.[154]

### d. The Parties Finalize the Agreements

Harpoon spun off Maverick at the end of December 2016.[155] On December 30, Harpoon and Maverick entered into the ATA, which governed the spinout.[156] A week later, Maverick and Millennium entered into the Collaboration Agreement, which provided for funding from Millennium, as well as the Warrant Agreement,

---

[150] *Compare* JX 405, at 27 (requiring disclosure of all intellectual property) *with* JX 433, at 30 (requiring disclosure of intellectual property "relating to the Maverick Field"); Tr. 1163:23–1165:25 (Evnin).

[151] *See* JX 904, at 3; Tr. 1231:12–1233:2 (Evnin); Guenot Depo Tr. 25:23–26:14, 29:1–18; 215:14–216:8.

[152] JX 500, at 1.

[153] Tr. 1180:3–1182:16 (Evnin).

[154] JX 500, at 1.

[155] Stip., ¶ 35.

[156] *Id.* ¶ 23; JX 1.

which provided Millennium with the right to later acquire Maverick.[157]   While Millennium planned to invest substantially in Maverick, it was not a party to the ATA.[158]   However, as noted, Harpoon sought Millennium's approval of the final ATA, and Harpoon had communicated with Millennium regarding the terms of all three Agreements.[159]

Under the terms of the ATA, Maverick provided Harpoon with a $6.75 million promissory note, payable in two years.[160]   Maverick transferred 4,086,720 shares of common stock and 15,000,000 shares of Series A Preferred Stock to Harpoon, which Harpoon disbursed pro rata to its shareholders.[161]   Also upon Maverick's spinout, Harpoon employees, including DuBridge, accepted employment with Maverick.[162] Evnin became the chair of the Maverick Board, Baeuerle became an observer of the Maverick Board, and both of them joined the "Takeda-Maverick Joint Steering Committee."[163]   At the same time, both Evnin and Baeuerle continued to serve on

---

[157] Stip., ¶ 23; JX 2; JX 3.

[158] Stip., ¶¶ 29–30.

[159] Tr. 237:13–20 (Hurff), 714:22–715:9 (Hiett); 1189:22–1191:4, 1199:8–17, 1256:20–1257:18 (Evnin), 1340:16–1341:10 (Hostetler).

[160] Stip., ¶ 38.  Harpoon has repaid this note.  *Id.*

[161] *Id.*

[162] *Id.* ¶ 39.

[163] *Id.* ¶ 40.

31

the Harpoon Board.[164]  Millennium recognized at least Baeuerle's dual service as a potential risk.[165]

After the spinout, Maverick renamed the ProTriTAC platform the COBRA platform.[166]

### e. Harpoon's Non-Compete

Under § 7.5 of the ATA, Harpoon agreed that it would not compete with Maverick in the Maverick Field for four years.[167]  This meant that Maverick had the exclusive right for four years to research, develop, manufacture, and commercialize any product in the Maverick Field.[168]  The finalized ATA defines the Maverick Field in § 1.56:

> "Maverick Field" means multi-specific Antigen-binding molecules that include: (a) at least one domain that binds to an Immune Effector Target that (i) is formed from two domains, each of which is impaired for Immune Effector Target binding, and (ii) undergoes a resultant increase in Immune Effector Target binding affinity of at least 50 fold after an activation event; (b) at least one domain that binds to one or more

---

[164] *Id.* ¶ 41.

[165] *See* JX 583, at 19.

[166] Stip., ¶ 39.  COBRA stands for Conditional Bispecific Redirected Activation.

[167] JX 1, § 7.5 (Harpoon agreeing that it would not "anywhere in the word, directly or indirectly, engage in the Business [of researching, developing, manufacturing or commercializing any product within the Maverick Field] in any manner . . . until four (4) years after the Distribution [of Maverick stock to Harpoon]" and that the noncompete was "reasonable and properly required for the adequate protection of Maverick's interest in the [business of researching, developing, manufacturing or commercializing any product within the Maverick Field].").

[168] Stip., ¶ 31.

32

Therapeutic Targets; and (c) at least one half-life extension domain, which domains (a) through (c) may be linked in various orders.[169]

The term "Immune Effector Target" is further defined in ATA § 1.43 as "a Target that is expressed by a T cell and induces a therapeutic cytolytic T cell response upon binding, provided that natural killer T cells shall not be considered T cells for the purposes of this definition."[170]

Plaintiffs testified that at the time the parties entered the ATA, the Maverick Field definition above encompassed all then-existing conditionally active T cell engagers.[171] Additionally, Plaintiffs testified that the Maverick Field was broad enough to encompass several approaches to conditionally active T cell engagers being used by other competitors then in the market.[172]

Various assets related to the Maverick field, including contracts, tangible assets, permits, books and records, claims, and a number of employees, were also transferred to Maverick under the ATA.[173] Following the transfer of the intellectual

---

[169] JX 1, § 1.56.

[170] JX 1, § 1.43. Harpoon requested a carve-out of "Natural Killer T Cells" from the definition to develop a different technology not at issue in this litigation. Stip., ¶ 27. The carve-out was narrow and did not affect Maverick's work. Tr. 267:12–268:23, 269:23–270:10 (Hurff).

[171] Tr. 209:21–210:1, 213:13–20 (Arendt), 551:24–554:1, 548:16–549:22, 556:20–557:3, 608:20-609:6 (DuBridge).

[172] This included molecules designed by CytomX, Amunix, and Genetech. Tr. 69:17–24, 209:21–210:1, 213:13–20 (Arendt), 551:24–554:1, 548:16–549:22, 556:20–557:3, 608:20–609:6 (DuBridge).

[173] JX 1, §§ 2.1(b)–(f), 4.1, Schedule 1.113.

property in the ATA, Maverick gave Harpoon the Grant-Back License to use the intellectual property "outside the Maverick Field."[174]

4. After the Spinout, Harpoon Develops a New Conditionally Active T Cell Engager

Following the Maverick spinout, Harpoon began generating ideas for a new conditionally active T cell therapy as early as January 2017.[175] Harpoon CEO McMahon testified that the search for a conditionally active platform that did not use the split scFv design began immediately after the spinout.[176] Baeuerle described Harpoon's early concepts, some of which he had begun developing before the spinout, as "science fiction" designs.[177] In March 2017, McMahon prepared a presentation for an investor that stated Harpoon was "unencumbered . . . to develop new protease-dependent activation of T and other immune cells."[178] Another presentation in June included the same language.[179]

---

[174] JX 1, § 2.2(b)–(c).

[175] Stip., ¶ 42.

[176] Tr. 1682:16–22 (McMahon).

[177] JX 537, at 1; Tr. 1464:1–11 (Baeuerle).

[178] JX 646, at 12.

[179] JX 690, at 27.

### a. Harpoon Continues to Avoid Disclosing its Work on Conditionally Active T Cell Engagers to Maverick or Millennium

However, in public statements after the spinout, Harpoon described the companies in a way that conformed to Millennium's understanding of a broad Maverick Field. In preparation for a Series B financing press release in May 2017, Harpoon's public relations consultant proposed text that stated Harpoon was "developing research platforms targeting [t-cells?] that become activated by proteases in the tumor micro-environment."[180] McMahon responded, "[d]o not say T cells – that is Maverick and Takeda would sue us."[181]

In a public comment for a Biocentury article on the spinout in June 2017, Evnin stated:

> In this particular case, [the spinout] made a lot of sense because we had somebody interested in a piece of the Harpoon portfolio of technologies, and they were willing to put a huge amount of money exclusively behind that one piece to make it the corner of the IP estate. [Harpoon and Maverick] obviously have a shared history, but these two companies now have their own distinct trajectory.[182]

Harpoon's head of business development emailed McMahon regarding Evnin's statement: "This is a great article..[.] although it seems to imply that Maverick got rights to all related conditionally-active TriTAC which I don't think is accurate. I'm

---

[180] JX 681, at 1.

[181] *Id.*

[182] JX 748, at 2.

35

sure Maverick doesn't know that but it is misleading..."[183]  In the same article, McMahon stated, "[w]e've carefully, strategically carved the Maverick platform out of Harpoon and it really is not competing.  This was a self-contained technology and was therefore relatively new and easy to bring into a separate business."[184]

In February 2018, Harpoon solicited Takeda—Millennium's parent company—for investment in its inherently active technologies.[185]  Harpoon modified the slide deck for its presentation to avoid disclosing its work on conditionally active T cell engagers.[186]  McMahon instructed Harpoon's head of business development to remove all references to the development of "Pro"—i.e. inducible—technologies from an existing investor slide deck for the purpose of sending it to Takeda.[187]  At trial, he testified that he did not want to reveal Harpoon's ProTriTAC research at that time because it would be competitive with Maverick, which Takeda was funding through Millennium.[188]  Evnin commented in the email chain, "[p]lease recall that Takeda is the Maverick partner . . . . they would not be excited to hear about some of [Harpoon's] work . . . . e.g. on T cell engagers."[189]

---

[183] JX 749, at 1.

[184] JX 748, at 2.

[185] JX 808.

[186] *See* JX 808; Tr. 1277:12–1278:2 (Evnin).

[187] JX 808, at 1.

[188] Tr. 1667:2–23, 1668:8–1669:4 (McMahon).

[189] JX 814, at 1.

And Baeuerle wrote, "Takeda will be super sensitive re conditional triTACs. And I will get under scrutiny . . ."[190] McMahon replied, "which is why we removed any reference to Pro-Tritac in the slides."[191]

### b. Harpoon Maintains Access to Maverick's Confidential Information

Following the Maverick spinout, both Evnin and Baeuerle had extensive access to Maverick's research at the same time that Harpoon was developing competing technology.[192] Evnin and Baeuerle participated in Maverick board meetings, joint steering committee meetings, and scientific advisory board meetings.[193] Baeuerle worked as an "acting CSO" at Maverick, and Evnin also worked intimately with the scientists at Maverick to develop Maverick's COBRA molecule.[194] Millennium witnesses testified that the company only granted this level of access based on the understanding that Harpoon was limiting its own work to inherently active platforms.[195] While Evnin recognized that with the development of a new conditionally active platform, Harpoon was working as a direct competitor

---

[190] *Id.*

[191] *Id.*

[192] Tr. 1273:11–1274:4, 1277:12–1278:2 (Evnin), 1558:16–1559:14 (Baeuerle).

[193] *Id.* at 549:8–15, 562:15–563:3, 564:4–566:21 (DuBridge), 893:8–894:14 (Scibetta), 653:13–654:3, 664:10–22, 670:16–672:15 (May).

[194] *Id.* at 1495:10–15, 1469:6–1471:1, 1558:16–1559:14 (Baeuerle).

[195] *Id.* at 417:23–418:8, 419:9–14 (Hurff), 74:2–19 (Arendt).

of Maverick, he did not disclose this fact to Maverick or Millennium.[196] Baeuerle and Evnin testified that they refrained from disclosing the competition due to their confidentiality obligations to Harpoon.[197] Likewise, other members of the Maverick Board, including Geesaman, knew of Harpoon's conditional platform and did not disclose it to Maverick for the same reason.[198]

Baeuerle testified that his practice was to "firewall" the intellectual property of each company he started to prevent it from influencing his work at subsequent companies; similarly, here, he testified he prevented what he learned in his work at Maverick from influencing his work at Harpoon.[199] Both Evnin and Baeuerle testified that they were not involved in the development of any conditionally active platforms at Harpoon, though Baeuerle's name would appear on slides and draft patent applications associated with the ProTriTAC technology, and Evnin would request to be listed as an inventor.[200] Further, in May 2017, Evnin sent an email to McMahon at Harpoon containing slides from a Maverick board meeting regarding

---

[196] *Id.* at 1174:20–24, 1175:15–20 (Evnin), 899:8–23 (Scibetta). Evnin conceded he would not allow someone working for a competitor to serve on Harpoon's Board due to the potential conflicts of interest. *Id.* at 1267:12–1269:17 (Evnin).

[197] *Id.* at 1516:23–1517:5 (Baeuerle).

[198] *Id.* at 488:1–10 (Geesaman). Dr. Dan Hicklin also served on both Maverick's and Harpoon's Boards and did not disclose Harpoon's ProTriTAC molecule. *Id.* at 940:19–941:18 (Scibetta).

[199] *Id.* at 1495:7–14, 1556:14–22 (Baeuerle).

[200] JX 718 (slide deck bearing Baeuerle's name); JX 730 (email chain discussing inventor-ship of patent application); JX 791 (email noting Evnin's request to be listed as inventor); Tr. 1278:3–19 (Evnin), 1559:15–24 (Baeuerle).

its conditionally active platform and wrote, "[s]ee these slides in case this sparks something."[201] Evnin described this at trial as an "inadvertent" disclosure of Maverick's confidential information, testifying that he had not intended to send the full contents of the email thread, but only a smaller portion that did not contain confidential information.[202]

### c. Harpoon Invents a New ProTriTAC Molecule

On June 1, 2017, Harpoon hired Dr. Jack Lin, in part to help develop conditionally active therapies.[203] Lin came to Harpoon with experience with antibodies, proteases, and "peptide masking," a technique with the potential to make protease-activated inducible therapies.[204] However, Lin had no direct experience with T cell engager technologies.[205] Lin's mandate at Harpoon was to develop an inducible platform without using the split scFv design.[206] He would be aided in this endeavor, he was told, by existing concepts and ideas already at Harpoon relating to inducible platforms.[207] Upon arrival, Lin checked to see if he was "allowed to talk freely with [Baeuerle] on everything we do on the inducible formats" because of "his

---

[201] JX 669, at 1.

[202] Tr. 1299:14–20, 1305:5–1306:4 (Evnin).

[203] Stip., ¶ 43.

[204] Tr. 1721:18–1725:19, 1726:3–1727:14 (Lin).

[205] *Id.* at 1727:7–14, 1797:22–1798:5 (Lin).

[206] *Id.* at 1732:24–1733:14 (Lin).

[207] *Id.* at 1799:17–1800:2, 1802:20–1803:1 (Lin).

affiliation with Maverick."[208]  Lin's supervisor, Dr. Holger Wesche, told him, "feel free to talk with [Baeuerle] about anything."[209]

Lin testified that within two weeks of employment at Harpoon, he had a scientific epiphany—a "serendipitous eureka moment."[210]  By incorporating a peptide mask into part of the albumin binding domain (the third binding domain of the TriTAC molecule), he could achieve conditional activity.[211]  He showed this to colleagues almost immediately, which included two meetings with Baeuerle on July 17 and 18 to discuss his concept.[212]  Baeuerle testified at trial that at the second of these meetings, he made a "tiny modification" of Lin's whiteboard drawings of the concept.[213]  After the meetings, Baeuerle prepared a slide deck outlining these concepts and naming the molecules depicted in the slides "Novel ProTriTAC Designs."[214]  This slide deck by Baeuerle was the first instantiation what became a key change from Lin's original insight in any Harpoon materials—that change being to mask the CD3 (i.e. the T cell) binding domain, rather than the tumor target

---

[208] JX 713, at 1.

[209] *Id.*

[210] Tr. 1745:4–15, 1800:3–12 (Lin).

[211] *Id.* at 1737:8–1740:10 (Lin).

[212] *Id.* at 1544:4–1545:8 (Baeuerle).

[213] *Id.* at 1543:4–1544:3 (Baeuerle).

[214] JX 717, at 2.  The name is admittedly easy to confuse with Harpoon's prior ProTriTAC, which was transferred to Maverick and subsequently renamed COBRA.  Going forward in this Memorandum Opinion, "ProTriTAC" refers to Harpoon's conditionally active molecule, and "COBRA" refers to Maverick's conditionally active molecule.

domain, as Lin had originally conceived it.[215]  Baeuerle emailed these slides to Lin and told him that he should "[f]eel free to modify and to take ownership for the slides."[216]

As noted previously, Baeuerle testified that he was uninvolved in the invention or development of Harpoon's ProTriTAC, and that he included his name on the slides only because he had created the graphics—not the ideas.[217]  According to his testimony, he contained his work at Harpoon entirely to inherently active technologies, and he never approached the ProTriTAC project except for this one interaction with Lin.[218]  Baeuerle and Evnin later emailed each other about Harpoon's new ProTriTAC design without including Lin on the correspondence or mentioning his role as designer.[219]  At trial, Lin testified that his supervisor, Dr. Holger Wesche, suggested the key change from his original idea—moving masking from the tumor to the T cell domain—which, once incorporated into the design, formed the core structure for Harpoon's new ProTriTAC molecule.[220] Lin suggested

---

[215] Tr. 1818:9–16 (Lin).

[216] JX 717, at 1.

[217] Tr. 1477:16–20.  As Baeuerle noted and the slide deck shows, Lin's name is listed first and in a larger, bolded font, which Baeuerle testified indicated the concepts were Lin's.  Tr. 1478:4–10 (Baeuerle).

[218] *Id.* at 1472:8–22 (Baeuerle).

[219] JX 730, at 2.

[220] Tr. 1745:22–1746:13, 1749:8–1750:2 (Lin).  Lin's testimony at his deposition was somewhat inconsistent.  Lin testified that Wesche's role, "[i]f any," was "not significant."  Lin Dep. Tr. 167:5–15.  However, at other points in his deposition, he identified Wesche as the one who

Wesche was identified as an author on the subsequent slide deck because he was Lin's supervisor.[221]

### d. Harpoon's New ProTriTAC Molecule

Harpoon's ProTriTAC molecule is a conditionally active T cell therapy platform.[222] It is a multi-specific antigen-binding molecule because it binds to: (1) a tumor antigen; (2) CD3 epsilon, which is an Immune Effector Target expressed on T cells, and (3) albumin.[223] In other words, the Harpoon ProTriTAC is "functionally similar" and utilizes the same "building blocks" as Maverick's COBRA molecule, except for the way that it activates.[224]

As described previously, the CD3 binding site is a specific type of T cell binding site, the part of the molecule that recruits T cells. The CD3 binding site is made of a scFv, which in turn is made of a vL chain and a vH chain.[225] Maverick's COBRA molecule prevents the scFv from recruiting T cells by keeping the two parts of the scFv separated until the molecule is in the tumor microenvironment.[226] Once

---

suggested the change in masking, consistent with his trial testimony. Lin Dep. Tr. 135:6–19, 136:8–137:18, 142:13–20.

[221] Lin Dep. Tr. 166:10-17.

[222] Stip., ¶ 49.

[223] *Id.* ¶ 50.

[224] Tr. 1558:4–15 (Baeuerle), 571:22–572:6, 572:18–573:7 (DuBridge); JX 970, at 1 (email from Scibetta to Baeuerle noting similarities of molecules); JX 987 (notes from DuBridge regarding conversation with Baeuerle about similarities of molecules).

[225] Tr. 1725:2–11, 1740:11–1741:20 (Lin).

[226] *Id.* at 589:1–5 (DuBridge).

there, the separators fall away, and the scFv comes together, creating an active T cell binding site.[227]  By contrast, in Harpoon's new ProTriTAC molecule, the scFv remains together at all times.[228]  But it is covered by a peptide mask that prevents it from recruiting T cells.[229]  In the tumor microenvironment, when the peptide mask is removed, the T cell binding site, already fully formed behind the mask, is fully freed to recruit T cells.[230]

Harpoon's ProTriTAC is also different as it relates to binding affinity. Because the scFv remains together, the immune effector target site (i.e. the scFv) maintains the potential to bind to T cells, and thus it has binding affinity.[231] However, because the peptide mask imitates the binding site on the T cell (and because the peptide mask is always nearby on the molecule), the scFv's binding affinity causes it to attach to the peptide mask rather than to T cells.[232]  Thus, as long

---

[227] *Id.*

[228] *Id.* at 1737:8–18 (Lin).

[229] *Id.* at 1736:19–1737:2, 1737:19–1738:2, 1739:18–1740:2 (Lin), 798:9–12 (Landes), 871:1–13 (Marasco).  As the witnesses explained, this peptide mask is a "decoy" located on a different part of the ProTriTAC molecule, and so the molecule tends to bind to it, thus preventing T cell recruitment, but the molecule is not *always* bound to the peptide mask, and so some of the time it has the potential to recruit T cells despite not being in the tumor microenvironment.  *Id.* at 1736:19–1737:2, 1737:19–1738:2, 1739:18–1740:2 (Lin).

[230] *Id.* at 800:3–14, 800:23–801:8 (Landes).

[231] *Id.* at 1930:20–1931:23 (Tidor) (discussing test that isolates the binding affinity of the immune effector target site and demonstrates it maintains binding affinity).

[232] *Id.* at 1733:14–1738:2 (Lin).

as the peptide mask inhibits the immune effector target's ability to bind to T cells, the ProTriTAC molecule as a whole will not bind to T cells.[233]

This is a graphic representation of Harpoon's new ProTriTAC molecule:



[234]

[233] *Id.*

[234] JX 785.

### e. The Building Blocks of Harpoon's ProTriTAC Molecule and Maverick's COBRA Molecule

Harpoon developed its new ProTriTAC molecule at a speed that Baeuerle testified surprised him, and which struck Maverick as evidence that Harpoon was using pre-validated research.[235] The companies' comparative costs reflected the speed of development: in total, Harpoon spent around $9.1 million to develop its ProTriTAC molecule, compared to Maverick's $40 million expenditure to develop its COBRA molecule.[236]

Conditionally active T cell engagers rely on several components, and each component, like the therapy drug itself, requires effort and expenditure to develop. Maverick estimates it has spent 150,000 hours of research in developing the COBRA molecule, including working over a year on the research necessary to select the individual components.[237] Building a conditionally active molecule requires selecting and developing, among others, four aspects: (1) tumor target selection, (2) proteases and protease cleavable linker selection, (3) combinations of these tumor

---

[235] Tr. 1552:21–1553:8 (Baeuerle) (testifying he was surprised at how quickly Lin was able to develop the ProTriTAC molecule), 788:9–789:5 (Landes) (testifying ProTriTAC's development exceeded ordinary speeds).

[236] *Id.* at 1759:20–1760:6 (Lin) (testifying that Harpoon's total research expenditures to date for ProTriTAC are around $9.1 million), 897:13-20 (Scibetta) (testifying that Maverick has spent around $40 million to date).

[237] *Id.* at 563:23–564:3 (DuBridge), 656:14–23, 659:13–17, 660:22–661:8 (May), 897:3–12 (Scibetta).

targets and proteases; and (4) tumor cell lines.[238]  Research regarding these component parts, like development of the technology as a whole, is highly confidential.[239]  Both Maverick's COBRA molecule and Harpoon's ProTriTAC molecule utilize identical component parts for the above aspects of their molecules.[240]  The similarity is close enough that a Maverick witness thought graphic presentations of the two molecules might be confused for each other.[241]

EGFR is a tumor antigen target with properties that make it a strong candidate for conditionally active therapies.[242]  EpCAM is another tumor antigen target with properties that also make it a candidate for conditionally active therapies.[243]  Maverick estimated it spent 24,000 hours of research determining that EGFR and EpCAM would be effective targets in combination with the protease MMP9.[244]  MMP9 is a tumor-associated protease that is used in T cell therapy because it is most often found in tumor microenvironments.[245]  Selecting MMP9 from the 569

---

[238] *Id.* at 563:4–22, 564:4–565:12 (DuBridge), 780:16–781:20 (Landes).

[239] *Id.* at 650:12–651:1 (May).  Maverick takes protective measures in its business practices to maintain this confidentiality, including confidentiality agreements, employee restrictions, and physical security measures.  *See* JX 923; JX 687; JX 789; JX 1090.

[240] Tr. 1768:19–1769:24, 1773:11–1774:6, 1780:21–1781:7 (Lin), 571:22–573:7 (DuBridge).

[241] *Id.* at 570:22–571:15 (DuBridge).

[242] *Id.* at 1768:19–1769:24 (Lin).

[243] *Id.* at 1774:1–1776:13 (Lin).

[244] *Id.* at 649:6–650:11, 656:14–23, 660:22–661:8 (May).

[245] *Id.* at 1748:11–17, 1781:20–1783:15 (Lin).

proteases in the human body required an estimated 12,000 hours of research from Maverick.[246]   HCT-116 is a cell line for human colorectal cancer, called a "xenograph model."[247]  Like the other components, it requires research to determine that it is an optimal cell line with relation to EGFR and EpCAM.[248]

Maverick considers its work on these components and their combinations to be trade secrets.[249]  Maverick's research could provide a roadmap to construct a viable therapy; however, various instances and combinations of EGFR, EpCAM, MMP9, and HCT-116 have been seen previously in available literature and used for the development of immunotherapies.[250]  Amunix, an immunotherapy competitor, had contemplated these four components in combination in a publicly disclosed

---

[246] JX 432, at 13 (identifying 569 proteases in the human body); Tr. 658:22–659:17 (May) (testifying the selection of MMP9 required 12,000 hours of research).

[247] Tr. 707:12–709:13 (May).

[248] *See* JX 651, at ¶ 452 (identifying possibility of combining EpCAM and HCT-116); JX 1076, at ¶ 109 (identifying HCT-116 as one of "[t]housands" of potential cell lines); Tr. 662:14–663:18 (May) (testifying regarding research required to select cell line).

[249] Tr. 648:6–11, 657:10–659:12, 660:2–11, 661:9–662:7, 662:14–663:18 (May), 779:12–780:2, 780:16–781:20 (Landes).

[250] *E.g.* JX 69 (article exploring EGFR); JX 79 (same); JX 90 (article exploring cell lines); JX 113 (article exploring application of MMP9); JX 580 (CytomX proof-of-concept poster identifying EGFR as tumor target); JX 651 (patent application identifying EGFR and EpCAM as tumor targets); JX 660 (Amunix proof-of-concept poster identifying EpCAM as tumor target); JX 738 (patent application identifying EGFR, EpCAM, and MMP9 as tumor targets and protease); Tr. 705:5–707:7 (May), 1790:17–1791:1 (Lin).  The Plaintiffs seek to exclude all scholarly articles offered by Harpoon as inadmissible hearsay, but I find that Harpoon is not relying on these scholarly articles for the truth of the matter asserted but rather for the fact of their publication, *i.e.*, to prove that certain scientific knowledge was publicly available. *See Freeman v. Minnesota Min. & Mfg. Co.*, 675 F. Supp. 877, 884 n.5 (D. Del. 1987).

patent application in March 2017.[251]   However, even this patent application contemplates several possible proteases in combination with EpCAM—in other words, it did not isolate these four as Maverick's COBRA molecule did.[252]

Harpoon offered additional evidence showing it possessed knowledge of each component as a possible tumor target, protease, or cell line from publicly available sources or past experience:

- Prior to working at Harpoon, Lin had worked on therapeutics that targeted EGFR and encountered studies suggesting it could be used as a tumor target, and at Harpoon he had access to data that pushed him toward its use.[253]   Harpoon had conducted prior research in 2016 contemplating EGFR as a tumor target.[254]
- Amunix identified EpCAM as a tumor target by March 2017, although it was one of many potential targets.[255]   Harpoon had contemplated EpCAM as a possible tumor target—among several options—in a prior patent application, and it conducted its own research on EpCAM in 2018.[256]
- Other companies published the use of MMP9 as a protease in conditionally active T cell therapies.[257]   Maverick disclosed its use of

[251] JX 651; *see also* Tr. 1790:17–1791:1 (Lin).

[252] Tr. 705:5–707:7 (May).

[253] Tr. 1769:12–24, 1770:5–1771:9 (Lin); *see also* JX 118 (CytomX poster showing EGFR as tumor target).

[254] JX 435, at 10 (2016 Harpoon presentation identifying EGFR as tumor target); Tr. 1769:19–24, 1771:10–24 (Lin).  Maverick also disclosed EGFR as a representative tumor target in its patent application for COBRA.  JX 738, at ¶ 17.

[255] JX 651; JX 660; Tr. 705:5–706:12 (May).

[256] JX 133, at 53 (Harpoon patent application identifying EpCAM among seven possible target antigens); JX 774, at 6 (Harpoon order form purchasing "EPCAM protein" for laboratory research); Tr. 1776:9–13 (Lin) (testifying that Harpoon conducted research regarding EpCAM binders in January 2018).

[257] JX 178, at 90–91 (2016 CytomX patent application identifying MMP9 as possible protease among large field of possibilities); Tr. 705:5–706:12 (May) (acknowledging Amunix disclosed

MMP9 in a patent application in September 2017.[258]    Harpoon conducted independent research to develop "protease-cleavable linker sequences," and it did not utilize the same sequences as Maverick.[259]

- HCT-116 has been used as a cell line in T cell engager research since 2010.[260]  Harpoon conducted research with HCT-116 in 2016 prior to the spinout.[261]  Additionally, other companies had publicly disclosed the use of HCT-116 for testing conditional T cell engagers.[262]

The usefulness of these components depends not only on the identification but also the combination in the T cell engager.  Combinations of EGFR, EpCAM, MMP9, and HCT-116 have also appeared in public literature as useful for the development of immunotherapies, though this literature typically presented a field of possible options, rather than the exact combination Maverick—and later Harpoon—utilized

---

MMP9 as possible protease in 2017); Tr. 1782:12–1783:10 (Lin) (testifying that both CytomX and Amunix provided evidence of the opportunity to use MMP9 as protease).

[258] JX 133, at 50 (March 2017 Maverick patent application disclosing MMP9 as one of a field of possible proteases); JX 738, at ¶¶ 358, 126 (September 2017 Maverick patent application disclosing "[t]he protease MMP9" as being "known to be overexpressed in tumor cells" and thus a selected protease); Tr. 602:6–13 (DuBridge) (acknowledging disclosure of MMP9 as one of many possible proteases).

[259] Tr. 1784:13–1785:15 (Lin) (testifying regarding independent experiments), JX 1076, at 43 (Ploegh's expert report comparing Maverick and Harpoon's linker sequences cleavable by MMP9 and concluding they are distinct).

[260] Tr. 707:12–709:13 (May) (acknowledging HCT-116's use known as early as 2010 and in connection with MMP9 by 2016), 1788:10–1789:18 (Lin) (testifying regarding available studies on HCT-116's use as cell line with relation to both EGFR and EpCAM); JX 48 (2004 paper on HCT-116); JX 79 (2010 paper addressing use of HCT-116 as cell line in T cell-engaging antibodies); JX 90 (2012 paper addressing use of HCT-116 in antibody targeting); JX 113 (2015 paper studying use of HCT-116 as cell line in relation to MMP9).

[261] JX 153, at 1 (email from Guenot explaining that "[t]he reason for picking HCT116 is that this model worked well for the EGFR"); Tr. 606:13–23 (DuBridge).

[262] JX 580 (CytomX poster utilizing HCT-116 as cell line in T cell engager); JX 651, at 32 (Amunix patent application disclosing HCT-116 with regard to T cell engager).

49

in their molecules.[263] Harpoon researched some combinations prior to Maverick's spinout.[264] However, it conducted no research regarding the specific combination of these four components—EGFR, EpCAM, MMP9, and HCT-116—prior to selecting them as components for its new ProTriTAC molecule.[265]

### f. Harpoon Announces the New ProTriTAC and Maverick Sues

Harpoon informed Maverick of its newly-developed conditionally active technology a few days before publicly announcing the platform at the annual meeting of the Society for Immunotherapy of Cancer ("SITC") in Washington, D.C on November 9, 2018.[266] Baeuerle called Maverick CEO Jim Scibetta on November 6 and told him that Harpoon was developing a conditionally active T cell engager.[267] Scibetta then spoke with Evnin, who confirmed that Harpoon was in fact a competitor with Maverick.[268] At the SITC conference, Harpoon announced its new molecule, ProTriTAC, and offered proof-of-concept data (the "SITC Poster").[269] Two days later, on November 11, Harpoon announced the closing of its $70 million

---

[263] *E.g.* Tr. 602:6–13 (DuBridge), 705:5–707:7 (May), 1790:17–1791:1 (Lin); JX 69; JX 79; JX 90; JX 113; JX 580; JX 651; JX 660; JX 738.

[264] Tr. 603:4–14, 604:12–17, 606:13–23 (DuBridge); JX 133, at 50, 53 (Harpoon patent application contemplating possible component combinations as of March 2016).

[265] Tr. 787:10–788:8 (Landes), 1833:14–1835:13 (Lin).

[266] Stip., ¶¶ 44–45.

[267] Tr. 897:23–898:13 (Scibetta).

[268] *Id.* at 899:8–23 (Scibetta).

[269] Stip., ¶ 45; JX 785.

Series C financing round, part of which would be used to develop its ProTriTAC platform.[270]

Over the next week, Scibetta had several meetings and phone calls with Harpoon. On November 12, Scibetta told Evnin that he should remove himself from the Maverick Board, and Evnin agreed.[271] Evnin told Scibetta that if Takeda wished to redo the deal, given the new competitive landscape, this was an option.[272] Scibetta then met with McMahon and learned that the ProTriTAC had been in development for eighteen months, ever since the spinout.[273] In further communications, Evnin acknowledged again that Harpoon and Maverick were competitors and noted, regarding their disagreement over whether the new ProTriTAC fell within the Maverick Field, that it was "too bad the Takeda lawyers missed that in drafting."[274] In a follow-up email on November 15, Evnin reiterated a willingness to revisit the deal with Takeda and Millennium based on Harpoon's new invention "if Takeda wants to get out of the Agreement."[275]

---

[270] Stip., ¶ 48.

[271] Tr. 909:14–910:10 (Scibetta). Evnin would ultimately resign a few weeks later, around Thanksgiving. Tr. 912:23–913:6 (Scibetta).

[272] *Id.* at 910:11–19 (Scibetta).

[273] *Id.* at 914:20–915:13 (Scibetta).

[274] *Id.* at 916:18–917:24, 956:1–24 (Scibetta); JX 983.

[275] JX 984, at 1.

*C. Procedural History*

Maverick filed its complaint and a motion for a temporary restraining order ("TRO") on January 3, 2019.[276] I heard argument regarding the TRO on January 18, 2019 and denied the motion.[277] On April 30, Millennium filed a Motion to Intervene.[278] I granted the Motion to Intervene on May 8, and Millennium filed its complaint on May 14.[279] Discovery motion practice and disputes followed, and I issued a Letter Opinion resolving some of them on August 9, 2019.[280] A six-day trial took place September 9 – September 13, and September 17, 2019. I heard post-trial argument on December 17, 2019, and I considered the matter fully submitted at that time.[281]

## II. ANALYSIS

Maverick filed claims against Harpoon for breach of contract and misappropriation of trade secrets. Millennium filed claims against Harpoon for fraud, tortious interference with business relations and with contract, unfair

---

[276] Verified Compl. for Inj. Relief for Breach of Contract and Misappropriation of Trade Secrets, D.I. 1; Pl.'s Mot. for Temporary Restraining Order, D.I. 1.

[277] Oral Argument on Mot. for TRO before V.C. Glasscock on 1.18.2019, D.I. 26.

[278] Mot. to Intervene, D.I. 110.

[279] Telephonic Oral Argument and Rulings of the Court on Millennium Pharmaceuticals, Inc.'s Mot. to Intervene, D.I. 147; Verified Compl. in Intervention, D.I. 135.

[280] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2019 WL 3763953 (Del. Ch. Aug. 9, 2019).

[281] Post-Trial Oral Argument Transcript, D.I. 351.

competition, and unjust enrichment. Although the parties offered some expert testimony regarding damages, I specified at trial that this initial Opinion would address issues of liability only—assuming damages—and that I contemplated a further damages stage contingent on my findings here.[282]

*A. Maverick's Claims*

1. Breach of Contract

A breach of contract requires (1) a contractual obligation, (2) a breach of that obligation, and (3) resulting damages.[283] "When the contract is clear and unambiguous," this Court will "give effect to the plain meaning of the contract's terms and provisions."[284] Plain meaning is often elucidated with help from dictionaries.[285] By contrast, "when contractual language in issue is reasonably susceptible to more than one meaning . . . extrinsic evidence will be considered to resolve the ambiguity."[286] However, "[c]ontract terms are not ambiguous merely

---

[282] Tr. 1980:12–1981:7.

[283] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

[284] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010) (citing *Rhone–Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[285] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." (citing *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del. 1996))).

[286] *Supermex Trading Co., Ltd. v. Strategic Sols. Grp., Inc.*, 1998 WL 229530, at *3 (Del. Ch. May 1, 1998).

because the parties to the contract disagree" about the meaning.[287]   As explained

below, I find the contract language of the Maverick Field definition unambiguous,

and so the contractual language is itself "the binding expression of the parties'

intent."[288]

The parties do not dispute that the non-compete in § 7.5 of the ATA is valid

and enforceable.  Their disagreement for the breach-of-contract claim is limited to

whether Harpoon's new ProTriTAC molecule falls inside of the Maverick Field.  If

it does, then Harpoon's development of the ProTriTAC molecule was and is in

violation of its non-compete under § 7.5.[289]

As previously described, the Maverick Field is defined in § 1.56 of the ATA:

> "Maverick Field" means multi-specific Antigen-binding molecules that
> include: (a) at least one domain that binds to an Immune Effector Target
> that (i) is formed from two domains, each of which is impaired for
> Immune Effector Target binding, and (ii) undergoes a resultant increase
> in Immune Effector Target binding affinity of at least 50 fold after an
> activation event; (b) at least one domain that binds to one or more

---

[287] *Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *2 (Del. Ch. Nov. 8, 2007).

[288] *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 56 A.3d 1072, 1105 (Del. Ch. 2012). Because I find the contractual language unambiguous, I do not resolve the parties' arguments regarding the step transaction doctrine and whose intent is relevant when considering extrinsic evidence.  Additionally, the parties made various evidentiary objections to evidence on the basis of irrelevance because it concerned the parties' intent (Harpoon) or undisclosed intent (Millennium).  In light of my finding here, I consider these evidentiary objections moot.

[289] ATA, § 7.5 ("Harpoon hereby agrees that, effective as of the Distribution, none of Harpoon nor any of Harpoon's controlled Affiliates (which, for the avoidance of doubt, shall not include Maverick) shall, anywhere in the world, directly or indirectly, engage in the Business in any manner . . . until four (4) years after the Distribution," with "Business" defined as "the business of researching, developing, manufacturing or commercializing any product within the Maverick Field.").

Therapeutic Targets; and (c) at least one half-life extension domain, which domains (a) through (c) may be linked in various orders.[290]

The parties agree that the Maverick Field encompasses the split scFv design for achieving conditionality utilized in Maverick's COBRA molecule. However, this fact does not entail that the language is therefore *limited* to the split scFv design. In other words, it would be improper to conclude that Harpoon's ProTriTAC falls outside the Maverick Field solely on the basis that it differs from Maverick's COBRA molecule. Nothing in the language chosen by the parties supports such a reading.

Although conceptually complex, the Maverick Field definition, broken down, describes seven characteristics of a molecule. If any one of these characteristics do not describe Harpoon's ProTriTAC molecule, then it falls outside the Maverick Field, and Harpoon did not breach the non-compete by developing it. The seven characteristics, which restate the Maverick Field in a perhaps more digestible manner, are:

1. The molecule is "a multi-specific Antigen-binding" molecule;
2. The molecule has "at least one domain that binds to an Immune Effector Target";
3. The domain that binds to the Immune Effector Target is "formed from two domains";
4. The two domains that form the domain that binds to the Immune Effector Target are "each . . . impaired for Immune Effector Target binding";

---

[290] ATA, § 1.56.

55

5. The domain that binds to the Immune Effector Target "undergoes a resultant increase in Immune Effector Target binding affinity of at least 50 fold after an activation event";
6. The molecule has at least one domain that "binds to one or more Therapeutic Targets"; and
7. The molecule has "at least one half-life extension domain."[291]

The parties' disagreement centers on the third, fourth, and fifth elements described above. The parties do not dispute that the ProTriTAC molecule satisfies the other four elements. In other words, the dispute centers only on § 1.56 (a)(i)–(ii), which describes the molecule's domain that binds to the Immune Effector Target (i.e. the T cell or immune effector target binding domain) as well as its binding affinity.

Based on the plain meaning[292] of the contractual language, I find Harpoon's ProTriTAC molecule is not within the Maverick Field. The language in § 1.56 (a)(i)–(ii) must be read as a whole to comprehend the plain meaning. The descriptions in subsection (a)(1), that the T cell binding domain is "formed from two domains" and that these domains are "each impaired for Immune Effector Target Binding," read in isolation, are reasonably susceptible to multiple interpretations.[293] However, the Maverick Field definition clarifies the proper reading in subsection

---

[291] ATA, § 1.56.

[292] "Plain," in this context, means clear, based on the language chosen by the parties, in light of the specialized knowledge sufficient to understand the technical terms used therein, as described in some detail in the Background section of this Memorandum Opinion. A finding of lack of ambiguity does not require that the language be immediately comprehensible to a casual reader or man in the street.

[293] ATA, § 1.56 (a)(i).

(a)(ii) when it states that the T cell binding domain "undergoes a *resultant* increase in Immune Effector Target binding affinity of at least 50 fold after an activation event."[294]  This language clarifies that the Maverick Field is describing a molecule activated through the *event* of separately impaired domains coming together to form the T cell binding domain, which does not describe Harpoon's ProTriTAC molecule. I explain in greater detail below.

First, the word "domain" in § 1.56 (a) refers to the T cell binding site.  As explained in the factual recitation, the T cell binding site is a scFv.[295]  The phrase "two domains" refers to the vL and vH chains that make up the two halves of the scFv.[296]  Thus, the phrase "formed from two domains" means that the scFv is "formed from" the vL and the vH chains.  Read in isolation, this is susceptible to multiple interpretations.  Harpoon contends that it describes an act of creation, in the sense that the Immune Effector Target binding domain is *created from* the joining of two domains.[297]  This comports with dictionary definitions of the verb "form," which include the intransitive meaning, "to take form: come into existence," as well

[294] ATA, § 1.56 (a)(ii) (emphasis added).

[295] JX 133, at 17–19, 58–59.

[296] *Id.* at 58–59; Tr. 1725:2–11 (Lin).

[297] Def. Harpoon Therapeutics, Inc.'s Opening Post-Trial Br., D.I. 307, ("Harpoon Opening Brief"), at 31–32, 34–35.

as the transitive form, "to arrange," or "to shape or mold into a certain state."[298] The Plaintiffs, conversely, contend that "formed from" merely means "comprising"; they argue that every scFv domain consists of a vH and vL domain, and therefore every scFv domain is "formed from" those two domains.[299] In other words, they argue that no act of creation is implied, and the words merely describe the makeup of a scFv domain.[300] This, too, comports with some dictionary meanings of "form," which can mean "to serve to make up or constitute."[301] Thus, taken in isolation, the phrase is susceptible to both readings.

Likewise, the phrase "each of which is impaired," read in isolation, is arguably ambiguous. Harpoon contends "each of which" implies the domains are *separately* impaired for binding.[302] Here, the definition uses "each" as a pronoun, which merely means "each one," but the adjectival definition of "each" means "every one of two or more people or things considered separately."[303] Thus, Harpoon's argument that

---

[298] *Form*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/form.

[299] Pl. Maverick Therapeutics, Inc.'s Post-Trial Br., D.I. 309, ("Maverick Opening Brief"), at 27–29.

[300] *Id.*

[301] *Form*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/form.

[302] Harpoon Opening Brief, at 31–33, 35.

[303] *Each*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/each.

"each" implies separate treatment is supported by the dictionary definition.[304]

Maverick contends "each of which" could be synonymous with "both of which"; they argue that as long as the vH and vL domains are impaired for Immune Effector Target binding, they are "each" impaired because they are "both" impaired.[305] "Both" means "the one as well as the other," but when used as a conjunction it can indicate "the inclusion of each of two or more things."[306] While the linguistic distinction between "each" and "both" suggests Harpoon's reading is more reasonable, when isolated, the phrase is susceptible to both interpretations.

The next subpart in the Maverick Field, § 1.56 (a)(ii), to my mind, resolves this ambiguity and clarifies what type of molecule design the Maverick Field definition is describing. It is worth reciting the contractual language again here:

> "Maverick Field" means multi-specific Antigen-binding molecules that include: (a) at least one domain that binds to an Immune Effector Target that (i) is formed from two domains, each of which is impaired for Immune Effector Target binding, and (ii) undergoes a resultant increase in Immune Effector Target binding affinity of at least 50 fold after an activation event. . .[307]

---

[304] Maverick argues that Harpoon redlines the contract by adding terms like "separately" and "formation event." Red-lining, or blue-pencilling, is a revision to introduce something not there; by contrast, a word's inherent meanings and connotations *are* present, and thus drawing out those meanings through dictionary work does not constitute improper red-lining or blue-pencilling. Rather, it is an illumination of the plain language already present.

[305] Maverick Opening Brief, at 30–32.

[306] *Both*, Merriam Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/both.

[307] ATA, § 1.56.

Thus, Section 1.56(a)(ii) states that the Immune Effector Target binding domain—which, as noted, is "formed from two domains . . . each of which is impaired"—"undergoes a resultant increase in Immune Effector Target binding affinity of at least 50 fold after an activation event."[308] The clarifying word is the word "resultant," and the key question is, what must the increase in binding affinity "result" from?

Harpoon points to the placement of the word "resultant" just after the provision that the Maverick Field refers to molecules formed from two impaired domains. Accordingly, it argues that a molecule in the Maverick Field is one where the increase in binding affinity results from the formation event that subpart (a)(i) describes, when two domains, each separately impaired, join to form the Immune Effector Target binding domain.[309] Maverick, by contrast, contends that "resultant" is used "to clarify that the post-activation event increase in binding affinity must be *caused by* the activation event."[310] They argue that placement of "resultant" in subpart (a)(ii) would make it absurd for the word to modify or clarify subpart (a)(i).[311] In other words, Maverick's construction is based primarily on the use of

---

[308] ATA, § 1.56(a)(ii).

[309] Harpoon Opening Brief, at 30–31, 36.

[310] Pl. Maverick Therapeutics, Inc.'s Post-Trial Reply Br., D.I. 322 ("Maverick Reply Brief"), at 12.

[311] *Id.* at 11–12.

parenthetical subpart designations within the sentence describing the Maverick Field.

I agree with Harpoon and disagree with Maverick.

*First*, the language in subpart (a)(ii), "undergoes a resultant increase in Immune Effector Target binding affinity of at least 50 fold after an activation event," already implies causation without the word "resultant." If "resultant" were jettisoned, and the subpart read, "undergoes an increase in Immune Effector Target binding affinity of at least 50 fold after an activation event," it would not lose any meaning, and this suggests that "resultant" is not clarifying the causality of the activation event but, rather, signifying the causality of the formation of the binding domain described in subpart (a)(i).[312]

*Second*, it is not—pace Maverick—absurd to read "resultant" as modifying the preceding subpart. I note that using parenthetic romanettes to designate subparts does not of necessity alter the meaning of the sentence so enhanced. I also note that it is a more natural construction that "resultant" follow, rather than precede, the language defining the causative force. "I walked under a low doorway, and as a result bumped my head" is a more natural English construction than "my resultant head bump occurred after walking through a low doorway." Maverick's reading is

---

[312] Technically, the use of "after" could be merely temporal, and not imply causation, but such would be a strained reading in context.

unnatural. Harpoon's is not. Thus, it makes sense that "resultant" refers to the just-described formation event, and not the to-be-described activation event, given its placement at the beginning of subpart (a)(ii). Moreover, this reading of the language resolves the arguably ambiguous phrases in subpart (a)(i). If the fact that the T cell binding domain is "formed from two domains . . . each of which is impaired" *results* in something, then it becomes reasonable to interpret those phrases as describing an event, as Harpoon does. That event, I find in light of the relevant science as explained in the evidence submitted at trial, can only reasonably be interpreted as the joining of separately impaired domains to form a functional binding domain. I do not find the "Maverick Field" reasonably susceptible to the Plaintiffs' reading because it would render "resultant" surplus, rather than giving the word its proper function, which is to clarify that the formation of the binding domain from two impaired domains results in an increase in binding affinity.

Having interpreted the contract language in the Maverick Field, I find that Harpoon's ProTriTAC molecule does not fit this definition. The ProTriTAC molecule has a fully-formed scFv binding domain from the beginning.[313] The vL and vH domains are both impaired, and it is not their joining that results in the increase in binding affinity; rather, it is the removal of the peptide mask from the

---

[313] Tr. 1737:8–18 (Lin).

fully-formed domain.[314]  Therefore, the ProTriTAC molecule is not "formed from two domains, each of which is impaired," and because there is no activation resulting from the formation event of separately impaired domains, it does not undergo "a *resultant* increase in Immune Effector Target binding affinity . . . after an activation event."[315]

Having made this determination, I do not need to resolve the parties' dispute over whether the ProTriTAC molecule undergoes a 50-fold increase in binding affinity, which is the other disputed portion of the Maverick Field definition.  I conclude, accordingly, that Harpoon has not breached the non-compete by developing the ProTriTAC molecule.

### 2. Misappropriation of Trade Secrets

Maverick has also brought a claim for misappropriation of trade secrets.  To succeed on its claim that Harpoon misappropriated trade secrets, Maverick must prove by a preponderance of the evidence that "(1) a trade secret exists; (2) the plaintiff communicated the secret to the defendant; (3) there was an express or implied understanding that the secrecy of the matter would be respected; and (4) the secret information was improperly used or disclosed to the injury of the plaintiff."[316]

---

[314] *Id.* at 800:3–14, 800:23–801:8 (Landes).

[315] ATA, § 1.56.

[316] *Elenza Inc. v. Alcon Labs. Holding Corp.*, 183 A.3d 717, 721 (Del. 2018)

I focus on the final element of the claim here because I find that even if trade secrets existed, Maverick did not prove at trial by preponderance of the evidence that the trade secrets were improperly used or disclosed to Maverick's injury.

What Maverick did successfully demonstrate is that Dr. Luke Evnin and Dr. Patrick Baeuerle put themselves in an improvident and conflicted situation at the two companies, and that this improvident situation led to reasonable suspicions of improper use of Maverick trade secrets. Maverick put forward evidence that made it reasonably conceivable to imagine that Evnin and Baeuerle acted as conduits to funnel Maverick's confidential information and research to Harpoon's own conditionally active ProTriTAC platform in violation of trade secret laws and their fiduciary duties. But reasonably conceivable is not probable, which is the burden of proof Maverick must carry. Harpoon offers an alternative explanation for ProTriTAC's success, which is that Dr. Jack Lin had a "serendipitous eureka moment" of insight, and that from this insight Harpoon built the ProTriTAC molecule using publicly available scientific knowledge as well as its own experience much more efficiently than Maverick. Important to my decision, I found Lin's testimony in this regard credible. Without evidence showing it was more likely than not that Harpoon built its molecule on illegitimately-obtained information, I decline to find liability for the misappropriation of trade secrets. I explain further below.

To briefly recount the facts, following the spinout, Evnin and Baeuerle remained intimately involved in the development of the COBRA molecule at Maverick.[317] Part of COBRA's development was the selection of component parts—immune effector targets, cancer cell targets, proteases, and cell lines.[318] Evnin and Baeuerle attended board meetings and acted as scientific advisors, and so they were exposed to all of Maverick's ongoing research.[319]

Meanwhile, Harpoon, without telling Maverick, was developing a competitive molecule, the development of which would unarguably benefit from the ongoing research at Maverick. Evnin and Baeuerle testified that they were not involved with Harpoon's development of ProTriTAC, and that they never informed Maverick of Harpoon's work due to confidentiality obligations.[320]

At trial, Maverick described several suspicious circumstances that arose from this scenario.

*First*, Lin brought his "new ProTriTAC" invention to Baeuerle and discussed it with him, and afterward Baeuerle created a slide deck outlining the concept and

---

[317] Tr. 1273:11–1274:4, 1277:12–1278:2 (Evnin), 1558:16–1559:14 (Baeuerle).

[318] *Id.* at 563:4–22, 564:4–565:12 (DuBridge), 780:16–781:20 (Landes).

[319] *Id.* at 549:8–15, 562:15–563:3, 564:4–566:21 (DuBridge), 893:8–894:14 (Scibetta), 653:13–654:3, 664:10–22, 670:16–672:15 (May), 1495:10–15, 1469:6–1471:1, 1558:16–1559:14 (Baeuerle).

[320] *Id.* at 1278:3–19 (Evnin), 1559:15–24, 1516:23–1517:5 (Baeuerle).

65

listing himself as an author alongside Lin—albeit in a smaller font.[321]  Baeuerle

discussed the "new ProTriTAC" with Evnin.[322]  He provided edits and commentary

on the SITC Poster that publicly disclosed the ProTriTAC molecule.[323]  Lin thanked

him on several occasions for his time and his help.[324]  At trial, Baeuerle testified that

his assistance was entirely cosmetic—creating graphics, fixing typos, acting as a

sounding board—rather than substantive.[325]  Similarly, Evnin discussed ProTriTAC

with Baeuerle and requested to be listed as an inventor due to an ancillary invention.

And while on one occasion, Evnin forwarded (probably inadvertently) confidential

Maverick information to Harpoon's CEO, Evnin also testified he never engaged

substantively with the ProTriTAC platform at Harpoon.[326]

*Second*, the SITC Poster revealed that ProTriTAC employed the same tumor

targets (EGFR and EpCAM), protease (MMP9), and cell line (HCT-116) as the

---

[321] *Id.* at 1544:4–1545:8 (Baeuerle); JX 717, at 2.

[322] JX 730, at 2.

[323] Tr. 1553:22–1556:1 (Baeuerle).

[324] *Id.* at 1555:4–1556:1 (Baeuerle).

[325] *Id.* at 1553:22–1554:13 (Baeuerle).  Maverick also points to a November 5, 2018 email from Baeuerle to Wesche in which Baeuerle writes, "Given that MAV is going for EGFR, we may want to do EpCAM to not appear overly competitive."  JX 952, at 1.  While this email is suspicious as it relates to Harpoon's competition, Maverick disclosed its use of EGFR in a patent application in September 2017.  JX 738; *see also* JX 767.

[326] JX 730 (email discussing inventor-ship of patent application); JX 791 (email noting Evnin's request to be listed as inventor); Tr. 1278:3–19 (Evnin); JX 669, at 1 (forwarding confidential information to Harpoon CEO McMahon); Tr. 1299:14–20, 1305:5–1306:4 (Evnin) (describing email disclosure as inadvertent).

COBRA molecule.[327] This appeared suspicious to Maverick, and rightly so: this exact combination of targets, protease, and cell line had never previously been used.[328] Maverick concludes the component research was misappropriated. Harpoon points to journal articles, patent applications, and presentations that it says allowed it to select from a narrow field of potential components and that made its ultimate choices the best candidates.

At trial, Lin testified as to how his team selected each component. Lin had prior experience and Harpoon had done prior research on EGFR.[329] Harpoon had conducted its own research on EpCAM and seen other patents that contemplated it as a tumor target.[330] Maverick, among other companies, had disclosed the use of MMP9 in conditionally active T cell therapies.[331] HCT-116 had been commonly used as a cell line, and patent disclosures and Harpoon's prior work suggested it was optimal.[332] In addition, a patent application by a third party—Amunix—disclosed the combination of these four elements in a narrow pool of possible options.[333] In

---

[327] Tr. 1768:19–1769:24, 1773:11–1774:6, 1780:21–1781:7 (Lin), 571:22–573:7 (DuBridge).

[328] *See id.* at 570:22–571:15 (DuBridge).

[329] *Id.* at 1769:12–24, 1770:5–1771:24 (Lin); JX 435, at 10.

[330] JX 651; JX 660; JX 133, at 53; JX 774, at 6; Tr. 1776:9–13 (Lin).

[331] JX 178, at 90–91; Tr. 1782:12–1783:10 (Lin); JX 133, at 50; JX 738, at ¶¶ 358, 126.

[332] Tr. 1788:10–1789:18 (Lin); JX 48; JX 79; JX 90; JX 113; Tr. 606:13–23 (DuBridge); JX 580; JX 651, at 32.

[333] *See* JX 651.

other words, Harpoon testified that it landed on the same combination of components for its ProTriTAC molecule because it independently determined, just as Maverick did, that this was the best combination of targets, protease, and cell line.

I agree with Maverick that this evidence is suspicious. Evnin and Baeuerle, by maintaining any interaction at all—even cosmetic commentary and guidance—with Harpoon's ProTriTAC platform, crossed the boundaries of divided loyalties at the two companies.[334] Consequently, and in light of Harpoon's fraud discussed below, I found their testimony of limited credibility. I also agree that viewing Harpoon's selection of an identical set of components as fortuitous merits a jaundiced eye. At the same time, Maverick offers only circumstantial evidence and asks me to infer from these suspicious circumstances that inappropriate disclosures in fact occurred. Taking the record as a whole, I find the evidence insufficient to reach that conclusion. Harpoon's witnesses—Lin in particular—testified credibly at trial about his revelatory scientific process, what role each person at Harpoon played, and how the initial "eureka" moment developed into the ProTriTAC molecule disclosed on the SITC Poster through the mining of publicly available scientific research as well as Harpoon's own internal research. In order to find for Maverick, I must find Lin's testimony to be deluded or perjurious, which strikes me, after hearing it, as unlikely. Weighing the evidence, the innocent invention of Harpoon's

---

[334] Notably, Maverick has not brought a breach of fiduciary duty claim against Baeuerle or Evnin.

68

ProTriTAC molecule is not so unlikely as to convince me that it is more likely than not that Harpoon lied about its development process.

In sum, Evnin's and Baeuerle's choices are by no means models of fiduciary behavior, particularly where divided loyalties and dual roles at competitive companies are involved. They should have maintained better separation than they did in their roles at the two companies. Harpoon's selection of the same components utilized in Maverick's COBRA molecule are suspicious at first glance—after hearing testimony, that selection, absent purloined information, also appears logical. The evidence does not convince me that it is more likely than not that Harpoon designed the ProTriTAC molecule using confidential information misappropriated from Maverick.

*B. Millennium's Claims*

Millennium never entered a contract with Harpoon. It was not a party to the ATA.[335] Thus, it cannot bring contract claims against Harpoon because Harpoon never made any contractual representations to it.[336] Millennium was a party to the Collaboration Agreement (under which it agreed with Maverick to fund Maverick research) as well as the Warrant Agreement (under which it obtained from Maverick

---

[335] Stip., ¶¶ 29–30; JX 1.

[336] Harpoon itself emphasizes this point in its post-trial briefing. *See* Harpoon Opening Brief, at 47–51.

a right to purchase Maverick after a set time period).[337]  The Agreements were sufficiently intertwined, however, that Millennium negotiated all three Agreements and gave final approval to the ATA.[338]  Millennium therefore brings *tort* claims against Harpoon, arguing that Harpoon fraudulently induced it into entering the Collaboration and Warrant Agreements with Maverick by misleading it into thinking that Maverick would have broad rights in the inducible T cell engager space free from competition from Harpoon for four years.

Millennium also claims that Harpoon's entrance into the inducible space with the invention of the ProTriTAC molecule constitutes tortious interference and unfair competition.  In the alternative, it argues Harpoon was unjustly enriched.  I find there is sufficient evidence to prove that Harpoon is liable for fraud, but I deny Millennium's claims for tortious interference with contract and business relations, and for unfair competition.  Because finding liability for fraud provides Millennium with a legal remedy, its claim for unjust enrichment—pled in the alternative—necessarily falls away.  My reasoning is below.

### 1. Fraud and Fraudulent Inducement

The elements of fraud and fraudulent inducement are the same[339]:

---

[337] *Id.* ¶ 23; JX 2; JX 3.

[338] Tr. 237:13–20 (Hurff), 714:22–715:9 (Hiett); 1189:22–1191:4, 1199:8–17, 1256:20–1257:18 (Evnin), 1340:16–1341:10 (Hostetler).

[339] Indeed, since inducement is an element of fraud, separating the torts is tautological.

(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.[340]

Each element of fraud has further legal nuances, which I explore as I walk through the elements below. After examining the evidence, I find that Harpoon fraudulently induced Millennium into investing in Maverick because, while affirming Millennium's broad understanding of Maverick's trajectory, Harpoon intentionally concealed its competitive efforts to avoid disclosing its understanding of the Maverick Field definition it crafted.

### a. Harpoon's False Representation

The first element of fraud, a "false representation," can take several forms: it may be an "overt misrepresentation" (*i.e.* a lie), a "deliberate concealment of material facts," or else "silence in the face of a duty to speak."[341] To show deliberate concealment, Millennium must prove that Harpoon "took some action affirmative in nature designed or intended to prevent, and which [did] prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts

---

[340] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018) (citing *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461–62 (Del. 1999); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

[341] *Stephenson*, 462 A.2d at 1074; *see also Corporate Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 1008 WL 963048, at *6 (Del. Ch. Apr. 10. 2008).

or some representation intended to exclude suspicion and prevent inquiry."[342] Likewise, if "before the consummation of a business transaction," Harpoon "acquire[d] information that the speaker 'knows will make untrue or misleading a previous representation that when made was true,'" then it had a duty to speak.[343]

Early in the spinout negotiations, Harpoon made several affirmative representations to Millennium. It emphasized that the Maverick technology was a broad discovery platform.[344] It represented that the concept behind the dual build-to-buys was Harpoon's continuation of inherently active therapies, with Maverick taking on conditionally active therapies.[345] This representation was not limited to conversations or discussions, merely. Harpoon offered a graphic presentation of the companies that confirmed these divergent paths: Harpoon would continue its work on inherently active engagers, and Maverick would work with the new inducible technology.[346]

---

[342] *Metro Comm. Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.3d 121, 150 (Del. Ch. 2004) (quoting *Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. 1981)).

[343] *Great Hill Equity Partners*, 2018 WL 6311829, at *32 (quoting *In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013)).

[344] Tr. 22:6–9 (Hurff), 8:16–9:10, 12:4–11 (Arendt), 1255:14–18 (Evnin).

[345] *Id.* at 1082:13–1084:4 (Evnin) ("[W]e would spin out the nascent conditionally active technology into a new company, which we then referred to as Maverick."), 20:16–24 (Arendt).

[346] JX 143, at 65 (PowerPoint describing the partnership as dividing Harpoon into "TRIDENTS [i.e. inherently active] (build to buy)" and "CD3 Inducible Platforms (spinout)"); Tr. 19:3–20:24, 21:8–23 (Arendt), 1082:13–23 (Evnin).

Early concept sheets the parties exchanged laid out this divide unequivocally: "Harpoon would spinout a newly created entity ('Maverick') that would hold the technology and intellectual property relating to its inducible T-cell engagement platform."[347]  Over the course of two months of negotiations, the parties exchanged six term sheets, and every one included identical language stating that the new Maverick company would contain "technology and intellectual property relating to [Harpoon's] inducible T-cell engagement platform."[348]  A presentation from future Maverick scientist Dr. Robert DuBridge and discussions with Millennium personnel confirmed this understanding: Maverick was set to explore conditional activation in a broad discovery platform, with numerous paths and iterations on the way.[349]

This evidence sufficiently proves that Harpoon understood that Millennium believed it was investing in the inducible T cell space, broadly defined, and not a specific technology.  The fact that presentations and discussions focused on the split scFv design currently at Harpoon does not disprove Millennium's broad understanding of the Maverick company trajectory: the original ProTriTAC (which

---

[347] JX 156, at 4.

[348] JX 156, at 4 (June 3, 2016 term sheet); JX 159, at 5 (June 13, 2016 term sheet); JX 168, at 8 (June 23, 2016 term sheet); JX 167, at 6 (June 24, 2016 term sheet); JX 169, at 8 (June 29, 2016 term sheet); JX 191, at 8, 20 (July 21, 2016 term sheet).

[349] Tr. 42:22–44:2, 44:23–45:21 (Arendt), 526:18–527:5 (DuBridge); *see also* JX 191, at 23 (defining "Maverick Platform Improvements" as "any optimization, enhancement, improvement or modification to any of the [various] components of the Maverick Licensed Intellectual Property").

became COBRA) was the inducible technology at Harpoon that would lay the groundwork for the Maverick space. This was the understanding Harpoon possessed when it drafted the Maverick Field.

Contemporaneous with drafting the Maverick Field, Harpoon stated freely in *internal* emails never shared or discussed with Millennium that it intended to draft a definition limiting the Maverick Field to the existing split scFv design.[350] Harpoon argues that these internal emails, such as Hostetler's descriptions of the Maverick Field definition as "simple and clear," conclusively demonstrate the lack of fraudulent intent or false representation.[351] The correspondence demonstrates that Harpoon, internally, found the language accomplished what it wanted in its contract with Maverick; it does not speak to how Harpoon then acted in its negotiations and dealings with Millennium.

Harpoon expressly contemplated the idea that it would continue to work on inducible T cell engagers, using concepts other than the split scFv technology it considered to comprise the Maverick Field.[352] Yet, Harpoon never used the terms "split scFv" or "split dimer" in the Maverick Field definition, and over the course of the next several months of ongoing negotiations, it never once clarified to

---

[350] JX 206, at 1; JX 227-A, at 1; see also Tr. 1095:14–1096:16 (Evnin).

[351] *See* JX 238, at 1; Harpoon Opening Post-Trial Br., at 62.

[352] *See* JX 246, at 1.

Millennium its narrower perception of the Maverick Field—indeed, it never used the terms "split scFv" or "split dimer" with Millennium *at all*.[353] Harpoon's silence is telling, particularly when Millennium personnel testified that they communicated their intent to move beyond the current inducible designs, which were, at that point, unproven.[354] Harpoon's trial testimony—that such clarifications were unnecessary because the definition it composed for its contract with Maverick was so clear it was "understood by all"—is unconvincing in light of the content and history of the negotiations that laid out such a clear direction for Maverick in the inducible space and a clear direction for Harpoon in the inherently active space.

Prior to signing the ATA with Maverick, Harpoon took several actions that demonstrate an active concealment of its intent to continue developing inducible T cell engagers. In the middle of negotiations, Harpoon filed a patent application for conditionally active technology.[355] It claimed it did not need to disclose the patent application because it did not relate to the Maverick Field—nonetheless, it withdrew the application and refiled it just after all three Agreements were finalized.[356] In the

---

[353] Tr. 78:13–79:10, 198:17–199:5 (Arendt), 450:6–15 (Geesaman), 532:11–533:1 (DuBridge), 1224:1–1225:10, 1261:21–1262:3 (Evnin), 1382:7–11, 1388:13–20 (Gerber), 1351:24–1352:3 (Hostetler); Guenot Depo. Tr. 21:18–25; JX 1, § 1.56.

[354] Tr. 78:13–79:10 (Arendt).

[355] JX 336.

[356] *See* JX 904, at 3; Tr. 1231:12–1233:2 (Evnin); Guenot Depo Tr. 25:23–26:14, 29:1–18; 215:14–216:8.

two months leading up to the spinout, Harpoon continued to communicate that the companies were on separate trajectories, divided along the boundaries of inherently and conditionally active technology. In November, Baeuerle sent plans to DuBridge and Wesche for the separation of the companies, entitled "Separation of Harpoon (TriTAC platform) and Maverick (Pro-TriTAC platform)."[357] In email communications related to its series B financing in the month before the spinout, Harpoon described the company trajectories in line with Millennium's understanding: "the Pro-TriTAC platform for conditional activation of T cells in the tumor microenvironment, has been spun out into sister company Maverick . . . Harpoon has retained rights for Pro-TriTACs (conditional activation in the tumor) for the engaging of all other immune cells (except T cells)."[358] In other words, Harpoon's public representation to Millennium could hardly have been clearer that the companies had distinct and divergent trajectories: Harpoon was not going to do work that Maverick did. In the same vein, prior to the deal's close, Guenot sought Millennium's approval for a narrow and specific carveout for inducible work on a specific type of T cell, "Natural Killer T cells."[359] This last-minute revision could

---

[357] JX 366, at 3.

[358] JX 430, at 1; *see also* JX 438, at 1; JX 456, at 1; JX 558, at 1; JX 590, at 1.

[359] Stip., ¶ 27.

only corroborate Millennium's view that if Harpoon wanted back into the broad inducible space it was giving to Maverick, it would ask for it.

In contrast to this presentation of the companies' trajectories as separate, in internal emails in the weeks leading up to the spinout, Evnin and Baeuerle discussed new ways to achieve conditionally active T cells but agreed to "invent after the deal is closed."[360] Similarly, Evnin told others at Harpoon to keep quiet about technologies at Harpoon that Takeda "do[es] not know about now."[361]

The testimony from Harpoon's witnesses at trial did not credibly overcome the scenario this evidence presents. Harpoon understood Millennium entered negotiations with a broad concept of investing in the inducible T cell space. Harpoon confirmed this understanding by representing the company trajectories as separate and exclusive. It then crafted the Maverick Field definition with the intent—which it took pains not to disclose—to limit the Maverick Field to certain technologies so that it could compete in the inducible space in the future. Knowing that if Millennium knew its intent, the Maverick Field would be renegotiated, it withdrew a patent, postponed invention, and encouraged silence rather than communication to avoid "raising the[] ire" of Millennium, who it understood conceived the Maverick Field differently.

---

[360] JX 474, at 1.

[361] JX 500, at 1.

77

This evidence is sufficient to prove that prior to the spinout, Harpoon made a false representation both by "deliberate concealment of material facts," and by maintaining "silence in the face of a duty to speak."[362]

### b. Harpoon's Knowledge that the Representation was False

A false representation, by itself, is insufficient; Millennium must also show that Harpoon knew of the falsity and made it with reckless indifference to the truth. This requires something more than ordinary negligence; Millennium must show that Harpoon exhibited conscious disregard for the truth.[363] I find this element satisfied.

The facts that demonstrate active concealment, described above, I find also demonstrate the *scienter* necessary for this second element of fraud. I will not repeat them in full. Harpoon understood Millennium's broad concept of the field. It confirmed that understanding by unequivocally representing that the companies had separate, non-overlapping futures—one with inherently active technologies, one with conditionally active technologies. It then drafted the Maverick Field definition to allow it to compete, but it maintained complete silence regarding its intent to compete. Harpoon's intentionality is demonstrated by its affirmative acts, such as withdrawing and refiling the patent application, and reminding Harpoon personnel not to discuss technologies on which it was actively working.

---

[362] *Stephenson v. Capano Dev.*, 462 A.2d 1069, 1074 (Del. 1983).

[363] *Metro Comm. Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.3d 121, 147 (Del. Ch. 2004).

The email exchange between Evnin and Baeuerle in the final two weeks before the spinout is illustrative of the knowledge Harpoon possessed. Baeuerle indicated that it "[w]ould be great to have a CD3 binding domain formed from two pieces defined in the Maverick Field (...because I have an idea to get to T cell engagers without."[364] Evnin responded, "I think if we invent something NEW it is not part of this deal. . ."[365] Baeuerle suggested, "[p]erhaps we should invent after the deal is closed" because the concept he was working on was "T's [Takeda's] nightmare."[366] The exchange provides a window in Harpoon's intent to compete with Maverick and its knowledge that it needed to keep this intent hidden from Millennium, the company that would invest in Maverick. This, in turn, demonstrates that it knew its representations of divergent company trajectories was false, and it knew that its silence was actively concealing the true nature of the spinout from Millennium.

Because the fraud claim necessarily focuses on Harpoon's actions to induce Millennium into participating in the spinout, my focus is on the period prior to Millennium's signing the Collaboration and Warrant Agreements. However, Harpoon's ongoing concealment, post-spinout, provides additional telling evidence

---

[364] JX 476, at 2.

[365] JX 474, at 1.

[366] JX 476, at 1.

of its knowledge during the negotiation phase. In preparing press releases in May 2017, Harpoon's CEO McMahon instructed the public relations consultant to eliminate mentions of Harpoon's work on conditionally active T cell engagers because "that is Maverick and Takeda would sue us."[367] In June 2017, Biocentury published an article, in which Evnin and McMahon both commented on the spinout and described the companies' trajectories in a way that confirmed Millennium's understanding—not Harpoon's.[368] McMahon specifically stated that Harpoon "carefully, strategically carved the Maverick platform out of Harpoon and it really is not competing."[369] Internal commentary on the article from Harpoon personnel show that it knew these statements were inaccurate.[370] Similarly, when Harpoon approached Takeda for funding of its inherently active platform, it scrubbed mention of its inducible T cell engagers to avoid scrutiny.[371] "Please recall that Takeda is the Maverick partner," Evnin wrote, "they would not be excited to hear about some of [Harpoon's] work . . . . e.g. on T cell engagers."[372]

---

[367] JX 681, at 1. McMahon's testimony at trial that his email was merely an "unfortunate phrasing" was unconvincing.

[368] JX 748, at 2.

[369] *Id.*

[370] JX 749, at 1.

[371] JX 814, at 1.

[372] *Id.*

Although evidence regarding post-spinout knowledge is not dispositive, it provides insight into Harpoon's knowledge of the falsehood it conveyed to Millennium through active concealment and silence. The parties' differing understandings of Harpoon's non-compete obligations as circumscribed by the Maverick Field and the companies' trajectories was not due to Harpoon's accident or its negligence. Rather, Harpoon, intending to continue to work on conditionally active T cell engagers, carefully avoided disclosing that intent, not just prior to the spinout, but for almost a year and a half afterward while it followed through and became a competitor with Maverick. I find that Harpoon had knowledge of its false statements made through concealment and silence.

> c. Harpoon Made the False Representations to Induce Millennium to Participate in the Maverick Spinout through the Collaboration and Warrant Agreements

The third element of fraud requires that the defendant made the false statements recklessly or with the specific intent to obtain the desired action.[373] Such *scienter* may be demonstrated through circumstantial evidence, including demonstrating motive and opportunity for the inducement.[374] In cases where a fraud claim centers on a transaction, the transaction itself may serve as both the motive and opportunity to commit the fraud.

---

[373] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009).

[374] *Id.*

Here, Millennium has demonstrated motive and opportunity that support finding Harpoon's false representations were made to induce Millennium to participate in the spinout through the Collaboration and Warrant Agreements with Maverick. As a part of the spinout, Harpoon received $6.75 million through a promissory note from Maverick, as well as over 4 million shares of Maverick common stock and 15 million shares of Maverick preferred stock, which it distributed to its stockholders pro rata.[375] Originally, when the parties first discussed a transaction in the spring of 2016, they contemplated a dual build-to-buy—Takeda would invest in both companies, with the option to purchase both.[376] Thus, motives were not necessarily skewed in one direction. By August 2016, when the parties were negotiating the Maverick Field, it was clear that Takeda was considering investing in only one build-to-buy, Maverick, which motivated Harpoon to ensure that it had an independent "growth path" for its future.[377] In October 2016, following Takeda's due diligence, Takeda (through Millennium) narrowed its interest to Maverick as a single build-to-buy.[378]

At that point, Harpoon faced a future as an independent company, and it had a motive to maintain a space for itself at the cutting edge of immunotherapy. As Lin

---

[375] Stip., ¶ 38.

[376] *Id.* ¶ 21.

[377] Tr. 1089:1–11 (Evnin).

[378] Stip., ¶ 22.

testified, inducible T cell engagers were the "next shiny thing," and they were where the market was likely moving in the immunotherapy space.[379] This would be confirmed for Harpoon shortly after the spinout as large pharmaceutical companies unanimously expressed interest in inducible technologies but not inherently active technologies.[380] On February 24, 2017, less than two months after the spinout, Harpoon's CFO quipped, "Maybe we can do another spin out? Whaler Therapeutics?"[381] He continued, "inducible seems very attractive to the market . . . [a]ssume this is why Takeda ended up with Maverick vs just an investment in Harpoon or ownership of Harpoon."[382] McMahon responded, "[s]omewhat foolish but we will take advantage of this enthusiasm next year."[383]

In addition to its motivation to maintain a cutting-edge space in immunotherapy, possibly to create another spinout, Harpoon had the opportunity. It still had Baeuerle and Evnin, who had invented the initial ProTriTAC concept that became the Maverick spinout. Baeuerle had ideas for new developments in the inducible space.[384] In fact, even during negotiations, Harpoon had ideas for

---

[379] Tr. 1827:4–19 (Lin).

[380] JX 644, at 2 (Merk); JX 740, at 2 (Eli Lilly); JX 758, at 6 (Pfizer), 12 (AZ/MEDI); JX 769, at 4 (Johnson & Johnson); JX 1200, at 2 (Eli Lilly).

[381] JX 644, at 1.

[382] *Id.*

[383] *Id.*

[384] *See* JX 476, at 2.

83

inducible T cell engagers far enough along to file a patent application.[385] Then, it had the opportunity to define the Maverick Field in collaboration with counsel, without the need to disclose that it was "trying to keep [the Maverick Field] focused on the current Maverick invention or something very close to it."[386] Meanwhile, Baeuerle was inquiring if Harpoon could get specific language into the Maverick Field definition that would allow him to design around it, and "get to T cell engagers without," a possibility he dubbed "T's [Takeda's] nightmare."[387]

In sum, I find that Millennium has proved, through competent circumstantial evidence, that Harpoon made its false statements with the intent to induce Millennium into investing in Maverick, and while Millennium thought Maverick would have plenary rights to the inducible T cell space, Harpoon maintained, through concealment and silence, its intent to continue innovation in that sector of immunotherapy, which was proving attractive to investors.

### d. Millennium Justifiably Relied on the False Representations

Millennium must also demonstrate it justifiably relied on Harpoon's representations when it participated in the spinout by entering the Warrant and Collaboration Agreements with Maverick. This means, first, that it did not know

---

[385] JX 336.

[386] JX 227-A, at 1.

[387] JX 476, at 1.

Harpoon made a false statement.[388]  Thus, if Millennium in fact shared Harpoon's understanding of the Maverick Field in negotiations, then it cannot have justifiably relied.  A plaintiff must not walk blindly into a situation, but rather is expected to undertake reasonable diligence to verify statements.[389]  If Millennium should have discovered Harpoon's intent or the plain meaning of the Maverick Field, it did not justifiably rely.

Finally, "the inducing 'representation must not only be material, but must concern an essential part of the transaction.'"[390]  In light of the fact that Millennium was aware of the language defining the scope of Harpoon's non-compete (i.e. the Maverick Field), and in light of the fact that I have found this language unambiguous, justifiable reliance is a steep hill for Millennium to climb despite the fact that it was not a party to the contract; nonetheless, I find it has reached that summit.

---

[388] *See Universal Enter. Grp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *14 (Del. Ch. July 1, 2013) (quoting *NACCO Industries, Inc. v. Applica Inc.*, 997 A.2d 1, 29 (Del. Ch. 2009)).

[389] *See Paron Capital Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *7 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013).

[390] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *33 (Del. Ch. Dec. 3, 2018) (quoting *E.I. DuPont De Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999)).

### i. Millennium did not Share Harpoon's Understanding of the Maverick Field

As just described, if Millennium *knew* that the Maverick Field was limited to the split scFv design and entered its contracts with Maverick with this understanding, then it did not justifiably rely on Harpoon's statements suggesting a broad company trajectory for Maverick, as examined above. It would be unreasonable of Millennium to knowingly agree to a narrow Maverick Field definition for the non-compete and at the same time rely on Harpoon's representations that the companies had non-overlapping trajectories, which implied that it would not be a competitor.

Harpoon does not deny that it refrained from explicitly discussing, during negotiations, the limitations it intended the Maverick Field to carry (Harpoon maintains that the definition was so clear and succinct such clarifications were unnecessary).[391] Instead, Harpoon essentially relies on five pieces of evidence that it contends demonstrate Millennium understood all along that the Maverick Field was limited to molecules that utilized the split scFv concept. I examine this evidence in some detail below because of the weight Harpoon places on it to demonstrate the parties' mutual understanding.

*The "3-year" alternative.* First, negotiations hit a snag when Millennium realized that as the Maverick Field was then currently drafted, Harpoon would be

---

[391] Tr. 1261:21–1262:3 (Evnin).

able to "generate an essentially similar platform" simply by using a T cell target other than CD3.[392] Harpoon initially rejected Millennium's resulting attempt to expand the Maverick Field definition to include all T cell targets.[393] Millennium's Chris Arendt worried that without this broader definition, he was "losing . . . exclusive inducible platform."[394] Chris Hurff summarized what Arendt hoped to accomplish by expanding the definition to all T cell targets: "Build a wall around all things T-cell (preclude any inducible platform to Harpoon for T-cells, not just CD3)."[395] In other words, it appears that Millennium believed that by expanding from a "CD3 target" to any "Immune Effector Target," it was effectively capturing the inducible T cell platform, which aligned with its understanding of the Maverick spinout.[396]

Hurff then listed several "alternatives" if Millennium could not successfully "[b]uild a wall around all things T-cell."[397] One of these alternatives was to impose "[s]ome time limit before Harpoon could do any T-cell work (3 years?)."[398] At that point, the ATA already contemplated a 4-year non-compete for Harpoon. Harpoon

[392] *See* JX 445, at 3.

[393] JX 433, at 13–14.

[394] JX 445, at 2.

[395] *Id.*

[396] *See* JX 445.

[397] *Id.* at 2–3.

[398] *Id.* at 3.

maintains that Hurff's suggestion of a 3-year prohibition on "any T cell work" shows that Hurff understood the limits of the Maverick Field and wanted to exchange a shorter non-compete for a broader field definition.[399] Harpoon improperly interprets this evidence, to my mind, for two reasons. First, it appears that at this juncture, Millennium believed it did *not* have exclusive rights to the inducible platform as long as the Maverick Field definition limited immune effector targets to CD3, rather than T cell targets broadly.[400] Thus, proposing a shorter non-compete in exchange for an expanded definition ("any T-cell work") makes some sense. The final Maverick Field definition in fact *expanded* the definition from "CD3" to the defined term "Immune Effector Target," and thus it appears that Millennium succeeded in expanding the definition without having to trade a shorter non-compete period. Based on Arendt's and Hurff's emails, it further appears that the expansion of the definition to "Immune Effector Target," from Millennium's perspective, successfully "precluded any inducible platform to Harpoon for T-cells."[401] In other words, Millennium thought it had sufficiently extended the "ring-fence" to support its (then and current) understanding of the Maverick Field. Therefore, the alternative

---

[399] Harpoon Opening Brief, at 52–55. At trial, Hurff struggled to explain what he meant, at one point proposing that he may have forgotten about the existing non-compete. Tr. 357:7–363:22 (Hurff).

[400] JX 445, at 3.

[401] *See id.* at 2–3.

3-year non-compete makes sense as an alternative proposition at a prior point in the negotiations. Second, Hurff's proposal, taken literally ("any T-cell work"), would also prevent Harpoon from working on *all inherently active* T cell engagers—essentially, it would shut Harpoon's doors for three years. I find Hurff's statement, from that point of view, imprecise at best, but Harpoon's proposition that it demonstrates Hurff's understanding of a narrow Maverick Field as it was ultimately defined is not credible.

*"Version 2" of Maverick.* Second, on the date the ATA was executed, December 31, 2016, Arendt wrote Hurff that "version 2" of the Maverick technology might be an "entirely new conditional approach if approved at [Joint Steering Committee]."[402] The ATA requires joint steering committee approval for any work done outside of the "Collaboration Field."[403] The Collaboration Field is identical to the Maverick Field, except that it limits immune effector targets to the most popular target: CD3. Harpoon interprets this statement to mean that Arendt understood the Maverick Field to be limited to the split scFv design because a "new version" referenced a new approach to achieving conditionality, which, Arendt was implying, was outside the Maverick Field. I find this unpersuasive. Arendt's statement,

---

[402] JX 562, at 1.

[403] The Collaboration Field is defined in § 1.13 of the Collaboration Agreement. JX 2, § 1.13. Sections 2.1.1(c) and 3.4 require joint steering committee approval for developments outside the Collaboration Field. JX 2, §§ 2.1.1(c), 3.4.

contemplating a "new version," matches up with his concerns expressed earlier that month that Millennium intended the Maverick platform to develop quickly beyond CD3 to other immune effector targets.[404] Such a development would require joint steering committee approval under the Collaboration Agreement. Given Arendt's previous emails and concerns, his reference to an "entirely new conditional approach" requiring joint steering committee approval is best read, to my mind, as a reference to non-CD3 immune effector targets, not methods of conditionality.

*Harpoon "can go for inducible."* Third, Hurff wrote in internal notes that from Arendt's perspective, "[Harpoon] can go for inducible, just not based on this IP."[405] Harpoon sees this as clear evidence that Millennium understood the Maverick Field was limited to "this IP," which per Harpoon referred to the split scFv design.[406] Once again, in the context of negotiations, this interpretation is not persuasive. This email chain is part of a key point in the negotiations in December 2016, when Millennium realized that if the Maverick Field only encompassed CD3 immune effector targets, then the Grant-Back License would permit Harpoon to create a knockoff technology by simply using a different immune effector target.

---

[404] *See* JX 445, at 3 (expressing a desire "to make sure that innovation can still happen in Maverick in terms of platform improvements/innovations beyond CD3.").

[405] JX 426, at 1.

[406] Harpoon Opening Brief, at 52 (Arendt's statement "is diametrically opposed to Millennium's current position that Harpoon *cannot* pursue inducible T cell engagers.").

Hence the email was entitled, "Chris A freaked out…"[407] As discussed, Millennium's ultimate reaction was to negotiate an expansion of the definition from CD3 to any "Immune Effector Target," which it believed effectively built a "ring-fence" around inducible T cell engagers. The entire sentence—rather than the snippet Harpoon extracts—makes sense in this context: "For this investment we need full IP; [t]hey can go for inducible just not based on this IP."[408] In other words, "this IP" logically refers to "full IP." To justify its massive investment in the Maverick technology, Millennium required access to the "full IP," or *all* T cell targets (not just CD3). Harpoon could continue to work on inducible technology, but it could not do so on "this IP," meaning it could not use inducible technology to target T cells.

*Conditionally active T cell engagers exist outside the Maverick Field.* Fourth, at depositions and at trial, Arendt and DuBridge both admitted that Harpoon's TetraTAC concept as well as certain other theoretical designs fall outside the Maverick Field, thus demonstrating that the Maverick Field could not have encompassed the entire inducible T cell space.[409] Moreover, Maverick's numerous

---

[407] JX 426, at 1.

[408] JX 426, at 1.

[409] Tr. 577:18–578:23, 579:4–10 (DuBridge), 199:11–200:4 (Arendt).

molecule designs—over 750 to date—all employ the split scFv design.[410] Showing that an inducible T cell engager invented after the spinout *can* fall outside Millennium's understanding of the Maverick Field, however, cannot reasonably be taken to mean that Millennium shared a narrow understanding of the Maverick Field. At the time of negotiations, all of Harpoon's designs utilized the split scFv design.[411] Arendt and DuBridge testified that they believed the Maverick Field encompassed other approaches to conditionality known *at that time*.[412] And Maverick had a good reason not to depart from the split scFv design following the spinout: namely, it worked. Having taken an unproven concept and created a functional molecule, there would be little motive to immediately move on to new designs.

*"T cell engager of the 'Maverick' design."* Fifth, in the final days before signing the ATA, Evnin and Guenot created deal summaries describing the Maverick Field as conditionally active T cell engagers of the "Maverick design."[413] Harpoon

---

[410] *Id.* at 518:21–519:1, 588:11–589:10 (DuBridge). Harpoon also points to Millennium's presentations at Takeda pre-spinout and notes that their descriptions of the technology all describe the split scFv design. *See* JX 262, at 8–9; JX 583, at 5–7; JX 1017, at 5, 6–7, 17, 25, 29; *see also* JX 171, at 2. Given that the initial ProTriTAC design was the sole then-current basis of Harpoon's inducible platform, it is hardly surprising that presentations and descriptions of the technology described that design. Millennium has pointed to other presentations and communications that indicate it intended to modulate and expand beyond that design. *See* JX 155; JX 187, at 49; Tr. 42:22–44:2, 44:23–45:21 (Arendt), 526:18–527:5 (DuBridge). Moreover, even in the presentations delivered to Takeda, the slides clearly stated, that Harpoon "would be prohibited from working on the inducible T-cell engagers." JX 583, at 5.

[411] Tr. 144:22–147:24 (Arendt), 386:1–13 (Hurff).

[412] *Id.* at 606:24–609:6 (DuBridge), 212:5–213:20 (Arendt).

[413] JX 550, at 1; JX 556, at 1.

argues that the Plaintiffs' failure to probe the meaning of these two words demonstrates that the recipients shared the understanding that the "Maverick Field" was limited to a "Maverick design" that, in turn, was limited the "split scFv" or "split dimer" design.[414]  But this is a tautology; if Harpoon wanted the words "Maverick design" to clarify its understanding of the Maverick Field after months of silence, then it needed to do more.  Without clarifying that the "Maverick design" is a *limitation*, these words simply state that the Maverick Field encompasses molecules of the design described in the Maverick Field.  If Millennium believed—as I find it did—that Maverick's design encompassed virtually all known conditionally active T cell engagers, then specifying that the Maverick Field is limited to the "Maverick design" does not narrow the Maverick Field.

In addition, I note that it was soon-to-be Maverick personnel, not Millennium, who received these deal summaries, and so using these emails as evidence of *Millennium's* understanding would be improper.[415]  Soon-to-be Maverick CSO

---

[414] Harpoon Opening Brief, at 44–46.

[415] Harpoon does not argue that this evidence should weigh against Millennium, only contending that it impeaches the testimony of *Maverick's* personnel. *See* Harpoon Opening Brief, at 42–46. Similarly, Harpoon says that the parties' shared understanding is evident because it gave presentations and sent slide decks to certain Maverick Board members post-spinout that should have alerted them to its work in the inducible T cell space, and no one objected. *See* JX 614, at 37–39; JX 1109, at 9; JX 1111.  The evidence does not suggest that Maverick personnel attended the presentations, reviewed the slides, or, if they did, that they should have understood that Harpoon was engaging in competitive work.  Moreover, Harpoon does not contend it shared any of this with Millennium.

Gerber and Maverick Board member Geesaman—who received these emails—testified that they "blew past" or "ignored" these words because they were so vague. It not reasonable to conclude, as Harpoon does, that the reason Gerber and Geesaman were unconcerned was because using the language "of the 'Maverick' design" comported with their understanding that their new company was limited to the split scFv approach to conditionality. Evnin and Guenot never used the term "Maverick design" elsewhere, and they also never used the terms "split scFv" or "split dimer" in negotiations.[416] If Gerber and Geesaman had probed the meaning of "Maverick Design," the parties may have been forced to clarify their understandings about the Maverick Field and the spinout, but their failure to do so does not demonstrate a tacit agreement as to Maverick's scope, and it certainly does not do so with regard to Millennium.

Harpoon put great weight on the evidence I have reviewed in depth, above. It argued that from these statements and this behavior, I should conclude that Millennium understood that it was investing in a specific design of a conditionally active molecule, and that it also understood that Harpoon was free to compete if it could come up with another design outside this limited scope.[417] Harpoon's

---

[416] Tr. 78:13–79:10, 198:17–199:5 (Arendt), 450:6–15 (Geesaman), 532:11–533:1 (DuBridge), 1224:1–1225:10, 1261:21–1262:3 (Evnin), 1382:7–11, 1388:13–20 (Gerber), 1351:24–1352:3 (Hostetler); Guenot Depo. Tr. 21:18–25.

[417] Harpoon Opening Brief, at 51–57.

interpretation of the evidence is strained. Each piece is either inconclusive or it supports the idea that Millennium was attempting to negotiate for—and thought it succeeded in negotiating for—a broad ring-fence around the conditionally active platform. The contemporary statements and presentations by Maverick and Millennium, and the credible testimony of several of their witnesses at trial, particularly Arendt and DuBridge, corroborate this interpretation of the evidence.

As a final note on this point, the access Millennium permitted to Evnin and Baeuerle post-spinout also supports the idea that Millennium believed Maverick to be working free from the threat of competition from Harpoon. Arendt credibly testified that neither Maverick nor Millennium would have allowed access to confidential information if they knew that Harpoon intended to contemporaneously develop a molecule with a similar function that would directly compete with the COBRA molecule.[418] Even Evnin admitted at trial that allowing such access to a board member of a direct competitor would be "unusual."[419] I would describe it as "inexplicable."

In the aftermath of the SITC Poster revelation, when Maverick's CEO Scibetta confronted Evnin about the ProTriTAC molecule, their divergent perspectives on the Maverick Field, and Harpoon's status as a competitor, Scibetta

---

[418] Tr. 417:23–418:8, 419:9–14 (Hurff), 74:2–19 (Arendt).

[419] *Id.* at 1267:12–1269:17 (Evnin).

95

testified that Evnin told him it was "too bad Takeda's lawyers missed that in drafting."[420] After months of silence regarding its understanding of the Maverick Field, and after its active concealment of its intent to compete, Harpoon appeared to confirm that Millennium "missed" something when it failed to comprehend the limits Harpoon embedded in the ATA's definition of the Maverick Field.

ii. Despite the Plain Meaning of the Maverick Field, Millennium Reasonably Believed the Maverick Field was Broad

Having found earlier in this Opinion that the Maverick Field definition is unambiguous and cannot reasonably be interpreted to include the ProTriTAC molecule, I nonetheless find that Millennium reasonably believed when it engaged in negotiations of the Maverick Field definition and entered the Collaboration and Warrant Agreements with Maverick that that definition encompassed the inducible space. As I noted earlier, proving justifiable reliance in the face of an unambiguous contract is a steep hill to climb. For the reasons described below, I find that in this unique context, Millennium has offered evidence demonstrating that despite the unambiguous contractual language between Harpoon and Maverick, it justifiably relied on Harpoon's false representations.

---

[420] *Id.* at 916:18–917:24, 956:1–24 (Scibetta); JX 983 (Scibetta's corresponding contemporaneous notes confirming Evnin's statement).

96

As a preliminary matter, the fact that the Maverick Field has a plain meaning does not mean that it has a simple meaning, or one that is easy to apprehend. The Maverick Field definition is highly technical and concerns scientific concepts. Despite the scientific training of those involved, failure to apprehend the plain meaning of a definition of a conditionally active T cell therapy platform that describes multi-specific antigen-binding molecules is not the same as, say, failure to apprehend contract terms for the sale of a used car, or even the sale of a mundane corporate entity. Millennium's failure to comprehend a contract I found difficult, yet unambiguous, does not conclusively show that Millennium walked blindly into its agreements with Maverick or failed to undertake reasonable diligence in ascertaining the meaning of the Maverick Field.[421] This is so for several reasons.

*First*, as Harpoon itself stresses, Millennium was not a party to the ATA.[422] As described in the factual recitation, the contractual posture was odd: prior to the spinout, the same Harpoon personnel who are now Defendants also represented and negotiated on behalf of Maverick.[423] Thus, while Millennium commented on, approved, and negotiated various terms in the ATA—including the Maverick

---

[421] *See Paron Capital Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *7 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013).

[422] Harpoon Opening Brief, at 47–48.

[423] *See* Tr. 1094:24–1095:4 (Evnin); Guenot Dep. Tr. 180:11–12 ("The Maverick deal team is . . . the same as the Harpoon deal team.").

97

Field—it was not a party to that contract, and was, per explicit contractual terms, not an intended beneficiary thereof, and it was not negotiating on behalf of the not-yet-existent company, Maverick. It was Harpoon's Guenot, not anyone at Millennium, who ultimately signed the ATA for Maverick.[424] As a result, Harpoon felt no need, legally or practically, to discuss or reveal its contractual intent with Millennium.[425] Harpoon, in fact, has maintained a joint privilege between itself and Maverick for the entirety of this litigation to protect communications that conveyed the contractual intent that existed between the parties to the ATA—Harpoon and Maverick. In other words, while Millennium was intimately involved in contract *negotiations*, Harpoon kept it at arm's length when it came to contract *communications*. Had Millennium been a party to the ATA, Harpoon might have divulged more of its intent regarding the "simple and clear" meaning it claimed that Harpoon and Maverick shared.[426]

*Second*, the evidence leads me to two pertinent factual findings. The first is that Harpoon was aware that Millennium thought it was investing in a company with rights to a broad field encompassing inducible T cell engagers free from

---

[424] *See* JX 1.

[425] *See* Harpoon Opening Brief, at 12–18.

[426] *See* JX 238, at 1. Harpoon argues that its attorney Hostetler's descriptions of the Maverick Field definition as "simple and clear" conclusively demonstrate the lack of fraudulent intent. Harpoon Opening Brief, at 62. This demonstrates that Harpoon, internally, found the language accomplished what it wanted; it does not speak to how Harpoon then acted in its negotiations and dealings with Millennium, or the reasonableness of Millennium's reliance thereon.

competition.[427]  The next is that Harpoon, with clear contractual intent internally, felt that it could nonetheless keep Millennium's misunderstanding intact and thereby avoid reopening contract negotiations.[428]  I conclude from these findings that Harpoon itself believed it was possible to create a binding contract based on a carefully nurtured misunderstanding by a non-party to that contract.

*Third*, as discussed above, the evidence in negotiations shows that Millennium realized the Maverick Field might be narrow, and it reacted by negotiating changes it believed returned the Maverick Field to a broad field definition it had first conceived.[429]  Originally, the Maverick Field only encompassed molecules that targeted CD3, the most popular T cell target.[430]  When the parties contemplated licensing back all of the Maverick IP to Harpoon for work outside the Maverick Field, Millennium realized that Harpoon could simply replicate a T cell engager with a different immune effector target.[431]  Understandably, Millennium's focus zeroed in on this part of the Maverick Field.  The correspondence in evidence supports the conclusion that when Millennium expanded the definition from CD3 to the defined term "Immune Effector Target," it believed that this expansion created a ring-fence

---

[427] *See* Section II.B.1.a–b, *supra.*

[428] *See* Section II.B.1.a, *supra.*

[429] *See* JX 433; JX 426; JX 445.

[430] *See* JX 433.

[431] *See* JX 445, at 3.

around inducible T cell engagers.[432]  In other words, with its focus on "Immune Effector Targets," and its belief from communications with Harpoon that Maverick was getting a broad field, Millennium may reasonably have failed to probe other facets of the intractable but nonetheless unambiguous descriptions in the Maverick Field.

*Fourth*, also discussed above, as of the time of the spinout, the Maverick Field encompassed all existing conditionally active T cell engagers so far as Millennium knew.[433]  Only after the spinout did Harpoon invent (or finish inventing) TetraTAC and the new ProTriTAC, causing Millennium to discover that the Maverick Field was not in fact all-encompassing.[434]  Inducible T cell engagers, however, were a new concept when Harpoon began developing its initial ProTriTAC.  Millennium witnesses credibly testified they believed the Maverick Field captured other inducible platforms being developed at competing companies.[435]  Thus, while Millennium could have negotiated for a more plain-spoken field definition, it was

---

[432] *Compare id.* at 3 (Arendt noting that a definition limited to CD3 did not encompass all T cell engagers, and that "defin[ing] the field as T cell engagement, not just CD3 engagement" would "preclude any inducible platform to Harpoon for T-cells, not just CD3") *with* ATA § 1.56 (finalized Maverick Field, with "CD3" replaced by defined term "Immune Effector Target").

[433] *See* Tr. 606:24–609:6 (DuBridge), 209:9–210:7, 213:13–20 (Arendt).  This included existing molecules designed by CytomX, Amunix, and Genetech.  Tr. 69:17–24, 209:21–210:1, 213:13–20 (Arendt), 551:24–554:1, 548:16–549:22, 556:20–557:3, 608:20–609:6 (DuBridge).

[434] *Id.* at 577:18–578:23, 579:4–10 (DuBridge), 199:11–24 (Arendt).

[435] *Id.* at 606:24–609:6 (DuBridge), 213:13–20 (Arendt).

not unreasonable, given the contract language and the state of immunotherapy, for it to rely on its broad understanding of the Maverick Field.

As a final note, Baeuerle testified that at the time of the spinout, his ideas for alternative methods of achieving conditionality—what would become TetraTAC—were "science fiction" concepts that never even approached workability.[436] Lin described his discovery of conditionality through peptide masks on the albumin binding domain as a "serendipitous eureka moment."[437] There is, to my mind, little reason to fault Millennium for not predicting then-unimaginable molecular concepts that would draw out the recalcitrant nuances of the Maverick Field definition.

This has been a long-winded explanation of why I find that Millennium reasonably believed—and thus justifiably relied on—a misapprehension of an unambiguous contract between Harpoon and Maverick. Millennium helped negotiate a complex and highly technical definition with Harpoon. Nonetheless, Millennium was not a party or third-party beneficiary to that contract, and so it is bringing a tort, not a contract claim. As such, its claim is that it relied on the many representations that Harpoon made to it during the course of the transaction, not merely the Maverick Field definition. Harpoon shut Millennium out of communications regarding its intent for the Maverick Field and actively prevented

---

[436] *Id.* at 1459:24–1460:15, 1531:9–24 (Baeuerle).

[437] *Id.* at 1745:4–15, 1800:3–12 (Lin).

Millennium from discovering its misapprehension. Harpoon has successfully demonstrated its understanding of the contract was correct. Thus, it has escaped contract damages. Nevertheless, and in light of all the evidence proffered, I find it reasonable to conclude that Millennium reasonably believed that Maverick's trajectory and Harpoon's non-compete were broad despite the lack of ambiguity in the Maverick Field definition.

### iii. A Broad Field Definition was a Causal Factor in Millennium's Decision to Enter the Collaboration and Warrant Agreements

As noted, the mere fact that information was material does not support fraud; the information must play a causal role in the decision that underlies the fraud claim.[438] Millennium witnesses credibly testified that Takeda would have considered the investment absurd if it imagined that it was investing in the intellectual property around a single method or path to conditionality and leaving the field open to competition from Harpoon.[439] Takeda, through Millennium, has invested tens of millions of dollars in Maverick to date, and plans to invest more.[440]

---

[438] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *33 (Del. Ch. Dec. 3, 2018) (quoting *E.I. DuPont De Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 462 (Del. 1999)).

[439] Tr. 422:4–423:5 (Hurff); *see also* JX 451, at 1–4; JX 527-PPT, at 3.

[440] Tr. 926:4–13 (Scibetta) (testifying Millennium invested over $100 million in "nondilutive financing" for the right to purchase Maverick), 1047:2–16 (Nachtwey) (testifying that Millennium has made investment payments of $65.25 million through the third quarter of 2019).

It would not have done so without the broad "ring fence" around conditionality that it believed Maverick would enjoy.[441]

### e. Millennium's Damages are Presumed at This Stage

Damages is the final element of proving a fraud claim. As noted, however, I indicated at trial that a damages phase would follow, contingent on finding liability.[442] At this point, I assume that Millennium suffered damages in satisfaction of this element of the tort, subject to proof at an ensuing damages phase.

### 2. Tortious Interference with Business Relations and with Contract

Millennium makes an argument that Harpoon interfered with its contractual and business relationships with Maverick. Tortious interference with contract requires (1) a contract, (2) the defendant's knowledge of the contract, (3) intentional interference with the contract without justification, (4) causing termination or breach, and (5) damage.[443] Here, a contract existed because Millennium entered the Collaboration and Warrant Agreements with Maverick. Harpoon, given its involvement in negotiations, clearly knew of these contracts. However, even if Harpoon interfered, Millennium has not demonstrated that Harpoon's actions caused a termination or a breach of the Collaboration or Warrant Agreements. Although

---

[441] *See* JX 426, at 1 (Hurff noting, "[f]or this investment we need full IP").

[442] Tr. 1980:12–1981:7.

[443] *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 357 (D. Del. 2006).

Millennium claims that Harpoon's actions "resulted in a Material Adverse Change" that constitutes a breach, it offers no evidence to support this.[444]  Therefore, I find Harpoon is not liable for tortious interference with contract.

Tortious interference with business relations requires (1) reasonable probability of a business relationship or expectancy, (2) intentional interference with the relationship or expectancy, (3) causation, and (4) damages, examined in light of a privilege to lawfully compete.[445]  Here, Millennium had a reasonable probability of a business relationship through its Collaboration and Warrant Agreements with Maverick.  There is no evidence, however, that Harpoon intentionally interfered with *Millennium and Maverick's* business relationship.  Even though, as I found, Harpoon fraudulently induced Millennium to enter the contracts with Maverick, Harpoon's actions in developing the ProTriTAC molecule were not aimed at—and did not disrupt—Maverick's ability to develop conditionally active T cell engagers, Millennium's ability to fund Maverick, or Millennium's option to purchase Maverick.  While the advent of a new competitor in the market may have changed the prospects of success, there is no evidence that Harpoon intentionally interfered with the business relationship between Maverick and Millennium, which is

[444] Corrected Post-Trial Br. of Millennium Pharmaceuticals, Inc., D.I. 316 ("Millennium Opening Brief"), at 68.

[445] *Lipson v. Anesthesia Serv., P.A.*, 790 A.2d 1261, 1285 (Del. Super. 2001).

circumscribed by the Collaboration and Warrant Agreements. Although the new competition changes the competitive landscape, Maverick's funding remains intact, and Millennium retains the option to purchase.[446] Therefore, Harpoon is not liable for tortious interference with business relations.

### 3. Unfair Competition

Millennium also contends that Harpoon has unfairly competed with it or with Maverick. The elements for unfair competition are (1) a reasonable expectancy of a business relationship, (2) defendant's wrongful interference with that relationship, and (3) defeat of the expectancy and harm.[447] In evaluating tortious interference with business relations above, I found that there was no wrongful interference with the business relationship that exists between Millennium and Maverick. There is no proof of interference with Maverick's or Millennium's trade with any third party; which, given current technology, would appear not to be possible. Thus, the second prong of the claim for unfair competition is not met, and Harpoon is not liable for this tort.

### 4. Unjust Enrichment

Unjust enrichment is an equitable concept, unavailable if a legal remedy exists. Millennium has pled unjust enrichment in the alternative if no tortious

---

[446] Tr. 1050:16–1051:19 (Nachtwey).

[447] *Ethpharm S.A. France v. Abbott Labs.*, 598 F. Supp. 2d 611, 618 (D. Del. 2009).

conduct is demonstrated.[448]  Having found that Millennium proved fraud on the part of Harpoon, Millennium has a remedy at law and the unjust enrichment claim falls away.[449]

### III. CONCLUSION

Maverick has not proved its claims against Harpoon for breach of contract or misappropriation of trade secrets, and those claims are dismissed.  Millennium has proved liability for fraud by Harpoon.  Millennium has not proved its claims for tortious interference with contract and business relations or unfair competition, and those claims are dismissed along with unjust enrichment, pled in the alternative.  The parties should confer and inform the Court about proceeding to a determination of damages for Harpoon's fraud liability and should provide an appropriate form of order consistent with this Memorandum Opinion.

---

[448] Millennium Opening Brief, at 71.

[449] Millennium Opening Brief, at 71 ("Takeda concedes that if it prevails on its other claims, it has a remedy at law; this claim is therefore presented in the alternative.").